## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COSI, INC., *et al.*,[1] | ) | Case No. 20- |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

## DECLARATION OF VICKI BAUE IN SUPPORT OF CHAPTER 11
## PETITIONS AND FIRST DAY PLEADINGS

I, Vicki Baue, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that:

1.     I am the Vice President & General Counsel, Chief Compliance Officer (CCO) and Secretary of Cosi, Inc., one of the above-captioned debtors and debtors-in-possession ("Cosi"). In addition, prior to the Petition Date, on February 22, 2020, I was appointed as an independent director of Cosi. Cosi is the ultimate parent company of the following related debtors and debtors-in-possession: Xando Cosi of Maryland, Inc. ("Xando"), Cosi Sandwich Bar, Inc. ("CSB"), Hearthstone Associates, LLC ("HALLC"), Hearthstone Partners, LLC ("HPLLC"), Cosi Franchise Holdings LLC ("CFH") and Cosi Restaurant Holdings LLC ("CRH"). Cosi, Xando, CSB, HALLC, HPLLC, CFH and CRH are collectively referred to herein as the "Debtors" or the "Company". Xando, CSB, HALLC, HPLLC, CFH and CRH are collectively referred to as the "Subsidiaries".

2.     I also have a similar role in each of the Subsidiaries, and I am familiar with the day-to-day operations as well as business and financial matters, books and records, and employees of the Debtors.

---

[1] The Debtors in these Chapter 11 Cases are the following entities (the last four digits of each Debtor's respective federal tax identification number, if any, follow in parentheses): Cosi, Inc. (3745); Xando Cosi of Maryland, Inc. (2196); Cosi Sandwich Bar, Inc. (0910); Hearthstone Associates, LLC (6267); Hearthstone Partners, LLC (9433); Cosi Franchise Holdings LLC (6984); and Cosi Restaurant Holdings LLC (3461). The Debtors' corporate headquarters are located at 500 Rutherford Avenue, Suite 130, Charlestown, MA 02129.

3.     I have been involved in the day-to-day operations of Cosi and the Subsidiaries since 2004, when I was appointed Vice President & General Counsel, CCO and Secretary.  I was also actively involved with Cosi in connection with the 2017 Chapter 11 Cases (defined and described below).

4.     Except as otherwise indicated, all statements in this declaration (the "Declaration") are based upon (a) my knowledge as Vice President & General Counsel, CCO and Secretary since 2004; (b) my review of relevant documents, including the Debtors' books and records, (c) information supplied to me by other members of Cosi's management team, including Jason F. Fensterstock, the Debtors' Chief Restructuring Officer (the "CRO") and/or third-party advisors, (d) my opinion based on my experience and knowledge of the Debtors' operations and financial affairs, and (e) my experience and knowledge concerning the restaurant industry generally.

5.     As the Vice President & General Counsel, CCO and Secretary (and as a director), I participated in the decision to cause the Debtors to file voluntary petitions for relief pursuant to chapter 11 of title 11 of the United States Code, §§ 101-1532 (the "Bankruptcy Code"). Ultimately, Cosi's board of directors (the "Board") authorized the bankruptcy filings and the Debtors filed these cases (the "Chapter 11 Cases") on February 24, 2020 (the "Petition Date").

6.     To minimize any adverse effects on their business as a result of the commencement of the Chapter 11 Cases, the Debtors have filed certain contemporaneous motions seeking "first day" relief (collectively, the "First Day Motions").

7.     The goal of the First Day Motions, among other things, is to: (a) continue with the Debtors' operations in the ordinary course of business while operating in chapter 11 with minimal disruption; (b) maintain the confidence and support of key constituencies; and (c) establish procedures for the smooth and efficient administration of these Chapter 11 Cases.  I have reviewed

the First Day Motions, and I believe that the relief they request is necessary to avoid immediate and irreparable harm to the Debtors' businesses, estates, and stakeholders from the filing of the Chapter 11 Cases.

8.     I am authorized to submit this Declaration on behalf of the Debtors and submit this Declaration in support of the First Day Motions and to provide additional background regarding the events leading to the filing of the Chapter 11 Cases and the Debtors' efforts to restructure the Debtors' businesses to maximize value.

9.     Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents, or opinion, I am authorized to submit this Declaration on behalf of the Debtors.

## I. GENERAL BACKGROUND

### A.     The Chapter 11 Cases.

10.     As discussed above, the Debtors commenced the Chapter 11 Cases on this date by filing voluntary chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware (the "Court").

11.     The Debtors continue to operate their business and manage their properties as debtors-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or statutory committee has been appointed in the Chapter 11 Cases.

### B.     Overview of the Debtors' Business.

12.     Cosi operates fast-casual restaurants, and provides associated catering services, featuring its flatbread made fresh throughout the day and specializing in a variety of made-to-order

hot and cold sandwiches, salads, bowls, breakfast wraps, bagels, melts, soups, flatbread pizzas, snacks, desserts, and a large offering of handcrafted, coffee-based, and specialty beverages. Cosi prides itself on using the best high quality ingredients.

13.    The original Cosi was founded by Drew Harre, who traveled to Italy from Paris, France in an effort to create the perfect bread for a sandwich.  While in Italy, he served as an apprentice to two brothers who baked in a hearth oven using a centuries-old flatbread recipe.  After concluding his apprenticeship, Mr. Harre traveled back to Paris and, in 1989, opened the first Cosi restaurant.  A few years later, two American brothers, Shep and Jay Wainwright, discovered Cosi in Paris and convinced Mr. Harre to sell them the rights to the restaurant outside of Paris.  In 1996, the Wainwright Brothers opened the first Cosi restaurant in America, in New York City.[2]

14.    The Debtors' corporate offices are located in Charlestown, Massachusetts.

15.    As is discussed below, Cosi's business model has evolved rapidly over the last two to three years.  The Company's catering business has grown and thrived, while what had been its core business – operating dine-in, fast casual restaurant locations – has continued to struggle, even after emergence from the 2017 Chapter 11 Cases (defined below) in May 2017.  As described below, a notable setback to the Company was the death in January 2018 of the principal of Cosi's majority shareholder upon emergence from the 2017 Chapter 11 Cases, which event caused uncertainty regarding the funding and strategic direction of the Company.  Following that passing, the Company continued to struggle operationally, the former majority shareholder (whose principal had passed) did not make further fundings, and all outside funding for the Company was

---

[2]    CSB was organized in Delaware in 1996 (and first Cosi Sandwich Bar was opened in NYC in 1996).  Xando, Incorporated a Delaware corporation, was organized in May 15, 1998.  Through related transactions, including a merger and name change, Xando Cosi, Inc. became the parent company in 1998 (and CSB because a wholly-owned subsidiary of Xando Cosi, Inc.).  Xando Cosi, Inc. changed its name to Cosi, Inc. in September 2001.

provided by an entity that was affiliated with the other shareholders of Cosi pursuant to the Exit Credit Agreement and the Bridge Credit Agreement (as defined and described below).

16.    Throughout 2018 and 2019, the Company continued to face challenges in its business.   In late December 2019, the Debtors made the decision to close 30 unprofitable restaurants and lay off employees as part of their prepetition effort to deleverage their balance sheet, bolster liquidity, and maximize value for stakeholders.   Therefore, as of the Petition Date, the Debtors now operate 13 Cosi restaurants, all but two of which are heavily involved in the Company's growing catering business.   The Debtors also operate three strictly "off-site" kitchens dedicated to the catering business.   Also, the Debtors have 16 franchise store locations.

17.    As of the Petition Date, the Debtors employ approximately 237 people, 74% of whom work on a part-time basis.   At the end of the Debtors' fiscal fourth quarter of 2019 (i.e., as of December 31, 2019), the Debtors had consolidated net sales of approximately $40 million, with net losses of approximately $7 million and cash on hand of approximately $500,000.[3]   These aggregate figures, however, do not tell a complete story.   Notably, the Company's catering business has performed well, showing strong sales growth year over year for 2020 year to date, and its remaining "customer-facing" restaurant operations, while now less than the majority of Company revenue, is currently seeing stable sales growth trends for 2020.

### C.    The Debtors' Corporate Structure.

18.    As noted above, the parent Debtor, Cosi, was first established in New York in 1996 and incorporated in Delaware in 1998.   Cosi is the parent company for the Subsidiaries.   Cosi is the principal operating company for the Debtors.   The Subsidiaries are tenants for certain of the

---

[3] The Debtors also have multiple depository accounts which are maintained at locations in proximity to the Debtors' restaurants and which have varying balances depending on day-to-day operations and restricted cash accounts, all of which are not included in the operating account balance above.

Debtors' locations. Cosi or CFH is the franchisor for certain of the Debtors' franchised locations and CFH otherwise has no assets or debts.

19.     A corporate organization chart reflecting the Debtors' current corporate structure is attached hereto as Exhibit A.  The current shareholders of Cosi and their percentage ownership as of the Petition Date are (i) AB Opportunity Fund, LLC ("AB Opportunity Fund") (35.90%), (ii) AB Value Partners, L.P. ("AB Value Partners") (14.68%), (iii) AB Management LLC (36.92%) ("AB Management"), and together with AB Value Partners and AB Opportunity Fund, (the "AB Funds") and MILFAM II L.P. ("Milfam") (12.5%). Two directors of the Debtors, Andrew Berger and David Polonitza, are affiliated with the AB Funds.

20.     The members of the Debtors' management team are located at the headquarters in Charlestown, Massachusetts or their offices in Mountainside, New Jersey, including senior management, human resources, accounting/finance, supply chain operations support, and other administrative functions associated with the Company.

**D.     2017 Chapter 11 Cases.**

21.     On September 28, 2016, the Debtors commenced cases under Chapter 11 of the Bankruptcy Code, which were jointly administered under Case No. 16-13704 (the "2017 Chapter 11 Cases") in the United States Bankruptcy Court for the District of Massachusetts (the "Massachusetts Bankruptcy Court").

22.     In connection with the commencement of the 2017 Chapter 11 Cases, funds affiliated with certain creditors of the Debtors (namely, Milfam, AB Value Partners and AB Opportunity Fund) provided debtor-in-possession financing to the Debtors as a bridge to a possible sale or reorganization.  On October 18, 2016, the Debtors and LIMAB LLC, a Delaware limited liability company ("LIMAB") that was controlled by Milfam, AB Value Partners and AB

Opportunity Fund entered into that certain Asset Purchase Agreement which provided for the sale of substantially all of the Debtors' assets to LIMAB (as amended from time to time, the "APA").

23.    However, pursuant to and in connection with the APA, an election was made to consummate the sale as part of a chapter 11 plan of reorganization for the Debtors rather than a standalone sale pursuant to section 363 of the Bankruptcy Code.

24.    The Debtors emerged from bankruptcy as reorganized debtors pursuant to *the First Amended Joint Plan of Reorganization of Cosi, Inc., Xando Cosi of Maryland, Inc., Cosi Sandwich Bar, Inc., Hearthstone Associates, LLC, and Hearthstone Partners LLC* (the "2017 Plan"), which was confirmed by the Massachusetts Bankruptcy Court on April 25, 2017 and became effective on May 10, 2017 (the "2017 Effective Date"). The 2017 Chapter 11 Cases are concluded and have been closed by the Massachusetts Bankruptcy Court.

**E.    The Debtors' Debt Structure.**

25.    Upon emergence from the 2017 Chapter 11 Cases, and as authorized under the 2017 Plan and confirmation order, the shares of reorganized Cosi were distributed to the AB Funds and Milfam in exchange for their prepetition claims and the Debtors were obligated under two principal sets of secured debt instruments: (a) a senior secured exit credit agreement with LIMAB that was designed to provide amounts needed to fund emergence from chapter 11 and future working capital needs and (b) a series of "Subordinated DIP Rollup/Exit Promissory Notes" issued to Milfam, AB Value Partners, and AB Opportunity Fund, which represented the roll-up of outstanding obligations of the Debtors under their debtor-in-possession financing facility under the 2017 Chapter 11 Cases.

26.    More particularly, on the 2017 Effective Date, as provided in the 2017 Plan and confirmation order, the Debtors entered into a certain Exit Credit Agreement with LIMAB, as the agent (the "Agent") for the several institutions from time to time party thereto (collectively, the

"Lenders")(as amended from time to time, the "Exit Credit Agreement"). The only Lender under the Exit Credit Agreement is LIMAB.[4]  The initial borrowings under the Exit Credit Agreement, in the amount of approximately $5,525,000, were made on the 2017 Effective Date and were used to fund certain bankruptcy exit costs, including distributions to unsecured creditors and immediate working capital requirements.  Cosi, as borrower, and certain of the Subsidiaries, as guarantors, secured all of their obligations under the Exit Credit Agreement by granting to the Agent, for the benefit of the secured parties under the Exit Credit Agreement, a first lien upon and security interests in all of their existing and after-acquired property.

27.    In addition, on the 2017 Effective Date, and pursuant to the 2017 Plan and confirmation order, Cosi incurred indebtedness in the original principal amount of $6,678,459.12, in the form of secured *"Subordinated DIP Rollup/Exit Promissory Notes"* (the "Rollup Notes"), which represented the rollup therein of the outstanding obligations of Cosi on the 2017 Effective Date under the Cosi's debtor-in-possession loan facility in the 2017 Chapter 11 Cases.  The secured Rollup Notes were issued to Milfam, AB Value Partners, and AB Opportunity Fund.

28.    In January 2020, as the Company faced substantial liquidity challenges in light of a number of store closings in December 2019 and the need to prepare for all contingencies, including a possible Chapter 11 filing, at the request of Cosi, LIMAB was willing to step up to the plate and provide emergency critical funding.  Thus, on January 16, 2020, the Agent, the Lender, and Cosi entered into a Bridge Priority Credit Agreement (the "Bridge Credit Agreement"), pursuant to which the Lender agreed to advance up to $1,200,000 of additional funds to Cosi in order to provide for immediate working capital needs by earmarking borrowings under such Bridge Credit Agreement for the payment of taxing authorities and other critical vendors or other creditor

---

[4] The owners of LIMAB on the 2017 Effective Date were certain of the AB Funds and Milfam.

entities. Fundings under the Bridge Credit Agreement for the full amount of the commitment were made on or about January 16 and February 18, 2020.

29.   As of the Petition Date, the outstanding principal amount of the loans under the Exit Credit Agreement was $23,882,795.81, consisting of (a) "Chapter 11 Closing Date Term Loans" in the aggregate principal amount outstanding of $5,525,000, (b) the "Converted Term Loan" in the aggregate principal amount outstanding of $4,790,000 (which amount represents revolving loans made under the Exist Credit Agreement on and after the 2017 Effective Date and converted into Term Loans pursuant to the Third Amendment to Exit Credit Agreement dated as of December 12, 2018), (c) "First Tranche Delayed Draw Term Loans" in the aggregate principal amount outstanding of $3,000,000, (d) "Third Amendment Term Loans" in the aggregate principal amount outstanding of $2,000,000, (e) "Fourth Amendment Term Loans" in the aggregate principal amount outstanding of $2,500,000, (f) "Fifth Amendment Initial Term Loans" in the aggregate principal amount of $2,000,000 (each of the terms in quotations as defined in the Exit Credit Agreement), and (g) the capitalized accrued and unpaid interest of $4,067,795.81.   The various series of term loans made under the Exit Credit Agreement after the 2017 Effective Date represent loans made, at the request of Cosi, under various amendments to the Exit Credit Agreement from time to time in order to provide working capital that was required for the operation of the business as Cosi continued to face challenges.

30.   As of the Petition Date, the principal amount under the Rollup Notes (all of which were issued on the 2017 Effective Date) was $6,678,459.12 plus accrued and unpaid interest in the amount of approximately $1,816,123.39.   The Rollup Notes are currently held by the AB Funds.

31.   In addition to the approximately $24 million in obligations owed to the Lenders under the Exit Credit Agreement and the Bridge Credit Agreement, and the approximately $6.7

million (plus accrued interest and other obligations) in obligations owed under the Rollup Notes, the Debtors believe they owe approximately $6 million to trade creditors and may be liable for approximately $2.5 million of rejection damage claims arising out of the rejection of the leases for the 30 closed locations.

**F.    Events Leading to These Chapter 11 Cases.**

32.    The Debtors emerged from the 2017 Chapter 11 Cases on May 10, 2017.  Almost immediately after, however, the Debtors experienced several challenges – some of which were unique to them, and others of which are common to the restaurant industry.  These challenges combined to lead the Debtors to where they are today – blessed to find themselves with an already successful and growing catering business, but one that is burdened by the costs associated with their historically predominant business model of operating restaurants.

33.    For many years prior to, during, and immediately following the 2017 Chapter 11 Cases, Cosi's largest investor was Milfam.[5]  I understand that Milfam had approached the AB Funds in 2014 to discuss the AB Funds interest in lending money to Cosi in a 2/3 Milfam 1/3 AB Funds structure. Prior to the 2014 loans, Milfam was one of Cosi's largest equity holders while the AB Funds had no existing investment in Cosi.  Through the 2014 loans, the AB Funds became investors in Cosi, and both Milfam and the AB Funds remained investors in Cosi prior to the 2017 Chapter 11 Cases.  Throughout this time period, Milfam had significantly more resources than the AB Funds.  The Company's expected ability to operate upon emergence from the 2017 Chapter 11 Cases was predicated on continued funding by Milfam and its principal, Lloyd I. Miller, III.  In early 2018, however, Mr. Miller died and Milfam thereafter decided to cease all of its funding

---

[5] Prior to the 2017 Chapter 11 Cases, Milfam held 66% of Cosi's indebtedness and was and had been for many years one of its largest equity holders. Milfam also became Cosi's single largest shareholder entity upon the 2017 emergence with 50% equity ownership and 66% ownership directly and indirectly of Cosi's indebtedness.

support to the Company and sought to extricate itself from its investment in Cosi. Prior to Mr. Miller's death, the Debtors and the AB Funds believed that Milfam would continue its financial support as it had been done in the past. As a result, much of the year 2018 for the Company revolved around negotiating the terms of its divorce from Milfam following the death of Mr. Miller, and dealing with the turmoil and disruption caused by this event. The divorce finally occurred in December 2018 when the AB entities purchased all of Milfam's interest in Rollup Notes and its interest in LIMAB, as well as substantially all of the equity in Cosi formerly owned by Milfam.

34.   Due to the sudden and severe reduction in available funding to the Company, the Company had no choice but to curtail its expenses by reducing its cost of goods and labor expenses.

35.   While these cost-cutting measures were necessary and helped to keep the Company afloat through 2018, they also contributed (along with a number of industry-wide factors) to deterioration in the in-store customer traffic trends in Cosi restaurants. Managing supply cost meant narrowing Cosi's menu offerings and changing a significant number of ingredients and products, while managing labor costs through a streamlined staffing model meant that the customer experience was changed and customer throughput at a Cosi restaurant during its busy dining periods was decreased. The end result was fewer customers than the Company anticipated when it emerged from the 2017 Chapter 11 Cases.

36.   At the same time, the Company's relationship with its broad line supplier, Gordon Food Services, terminated, and U.S. Foods was brought in as the new broad line supplier. A change in broad line supplier is disruptive and a monumental event for a restaurant business, and this only increased the challenges the Company faced in 2018.

11

37.    In 2019, although the challenges of 2018 were weathered, the Debtors' cash flow available for operations and for debt service continued to be negatively affected by overall economic conditions within the "fast-casual restaurant" industry, which in turn negatively affected sales and restaurant-level profits.    Among these factors were (and are) shifting consumer tastes and preferences, growth in labor and commodity costs, and unfavorable lease terms.    In addition, the proliferation of other fast casual and quick-service restaurants as well as online delivery platforms have created new competition for the Debtors' potential "in-store" customers.    These negative factors required the Debtors to make additional significant borrowings under the Exit Credit Agreement from LIMAB (which was now owned 100% by the AB Funds) during calendar year 2019.

38.    In 2010, Cosi had 142 corporate locations and $106.6 million in restaurant net sales, with approximately $6.9 million of those sales being net catering sales (6.5% of restaurant net sales).    After the Company's recent transformation, Cosi has 13 customer facing locations and 3 catering commissaries with approximately $20 million in annualized net restaurant sales.    Over $10 million of those net restaurant sales today are net catering sales (greater than 50% of restaurant net sales).    Since 2010, Cosi's physical locations have declined by over 80%, its restaurant net sales have declined by over 88%, while its net catering sales have grown 44% over that same time period.    Cosi's catering business has continued on a long term growth trend over many years despite the Company's legacy in-store business model struggles.    Cosi's traditional in-store sales has historically had lower margins than its catering sales due to its higher cost structure.    Cosi's continued focus on its catering business as the driver of its business should yield increased profits while also following consumer trends away from in-store dining and toward off premises delivered dining.

39.    There were very positive developments in 2019, however, with regard to the Debtors' burgeoning catering business, and these gains have continued in early 2020.

40.    Since May 2019, Cosi has seen year over year gross monthly revenues [6] in this catering business increase every month for 9 consecutive months.  This is at the same time Cosi significantly reorganized its business model and shut 70% of its physical store presence.  Within certain of Cosi's existing markets, the brand no longer has any of its legacy "customer facing" traditional locations, which were very expensive to operate.  That model has been largely replaced with a low cost kitchen model that has a significantly lower rent structure (50-90% less lease costs than Cosi's legacy stores), and allows for the catering business within a market to maintain and grow based upon Cosi's sales and marketing abilities along with customer's awareness of the Cosi brand as a reliable catering company that focuses on catering to office meetings and events.

41.    This transformation of the Company's business model to a catering focus has improved all the major cost elements that a restaurant business has compared to Cosi's legacy model, with food, labor and lease costs all declining as a percentage of net company sales due to the margins of Cosi's catering business when compared to its legacy in-store business, along with the ability to execute the catering business without relying on expensive real estate leases that Cosi had signed over its 20 year history. This new catering operating model will be focused on growing existing markets where the Cosi brand is well recognized.

42.    I, along with other members of the Board and the management team, have investigated how to best situate the Debtors on a path to profitability.  The solution, we have determined, is to foster and protect the promising catering business while sharply curtailing the

---

[6] This include tips, taxes and delivery fees and are before any 3rd party fees and commission are deducted.

traditional "front counter" model whose sales do not support the labor and leasing costs which such a business model requires.

43.    The Debtors filed these Chapter 11 Cases to prevent a full shut-down of operations of all of the Company's operations, including the profitable catering business, for the benefit of their stakeholders and to preserve the jobs of nearly 240 employees working in the "new" Cosi.

44.    This is not, however, a typical "Chapter 22" case, in which a debtor attempts to accomplish the same objectives as in an initial chapter 11 case or to liquidate its assets. The Company's old business model does not work any longer. The Company is already seeing, however, that its new business model, revolving around its catering business, does work. These Chapter 11 Cases are intended to allow the new Cosi to maximize the value in this healthy and growing business for the benefit of the Company's stakeholders.

45.    In the months prior to the Petition Date, the Debtors took various steps to improve their financial performance. The Debtors closed 30 unprofitable restaurant locations, and refocused on promoting the catering business and identifying the leasehold space and other overhead required to support that business.

46.    In addition, the Debtors retained a chief restructuring officer, Jason F. Fensterstock, (the "CRO") to assist with the development and implementation of the business plan. The CRO has been fully engaged for the past 60 days reviewing and assessing all aspects of the Debtors' business from a bottoms-up perspective. The CRO has identified numerous areas where additional cost cutting must occur, and those initiatives are underway.

47.    The Debtors believe that once those initiatives are implemented and take hold, the business can and will be profitable and poised to emerge from these proceedings.

## II. <u>FIRST DAY MOTIONS</u>

48.     The Debtors have filed a number of First Day Motions which address issues necessary to operate during the Chapter 11 period.  The Debtors have also requested that the Court conduct a hearing as soon as possible to hear the First Day Motions (the "<u>First Day Hearing</u>").  A description of each of the First Day Motions is provided below.

### A.     <u>Motion for Joint Administration of Chapter 11 Cases.</u>

49.     By this motion (the "<u>Joint Administration Motion</u>"), the Debtors request, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rule 1015-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), the entry of an order directing consolidation of these Chapter 11 Cases for procedural purposes only.

50.     I believe that the joint administration of the Chapter 11 Cases will save the Debtors and their estates substantial time and expense because it will remove the need to prepare, replicate, file, and serve duplicative notices, applications, and orders.   Further, I believe that joint administration will relieve the Bankruptcy Court of entering duplicative orders and maintaining duplicative files and dockets.  The United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>") and other parties in interest will similarly benefit from joint administration of the Chapter 11 Cases, sparing them the time and effort of reviewing duplicative pleadings and papers.

51.     I believe that joint administration will not adversely affect creditors' rights because the Joint Administration Motion requests only the administrative consolidation of the estates, and does not seek substantive consolidation.  As such, each creditor will continue to hold its claim against a particular Debtor's estate after this Joint Administration Motion is approved.  Accordingly, I believe that joint administration of the Chapter 11 Cases is in the best interests of the Debtors, their estates and all parties in interest, and should be granted in all respects.

**B.**    **Debtor's Motion for Entry of an Order (I) Extending the Debtors' Deadline to File List of Creditors and Schedules of Assets and Liabilities and Statements of Financial Affairs and (II) Granting Related Relief.**

52.    The Debtors request entry of an order, pursuant to sections 105(a) and 521 of the Bankruptcy Code and Rules 1007 and 9006 of the Bankruptcy Rules and Rule 1007-1 of the Local Rules setting a deadline forty-five (45) days after the Petition Date by which the Debtors must file their respective schedules of assets, liabilities and executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") (the "Schedules and Statements Extension Motion").

53.    The additional time requested in the Schedules and Statements Extension Motion should help to ensure that such documents are as accurate as possible.  The additional time will also help ensure that the relevant information is fully processed through the Debtors' information systems and can be incorporated into the relevant schedules.  Based on the foregoing, and due to the other pressing activities in which the Debtors and their professionals are engaged at this time, I believe that additional time to finalize the Schedules and Statements is warranted under the circumstances.

**C.**    **Debtors' Motion For Entry of Interim and Final Orders (I) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtors on Account of Prepetition Amounts Due; (II) Deeming Utility Providers Adequately Assured of Future Performance; (III) Authorizing the Debtors to Establish the Adequate Assurance Deposit Accounts and Pay the Adequate Assurance Deposits; (IV) Establishing Procedures for Objection to the Adequate Assurance Procedures; (V) Requiring Utility Providers to Return Deposits for Utility Services No Longer In Use; and (VI) Granting Certain Related Relief.**

54.    In connection with operating their business, the Debtors incur utility expenses in the ordinary course of business for, among other things, water, sewer service, electricity, gas, local and long-distance telecom service, data service, waste disposal and other similar services (together, the "Utility Services") from various utility companies (collectively, the "Utility Providers").  By

this motion (the "Utilities Motion"), the Debtors request that the Bankruptcy Court enter an order, pursuant to sections 105 and 366 of the Bankruptcy Code: (1) prohibiting the Debtors' Utility Providers from altering, refusing or discontinuing services to, or discriminating against, the Debtors on account of prepetition amounts due; (2) determining that the Utility Providers are adequately assured of future payment; (3) authorizing the Debtors to establish an adequate assurance deposit account and to pay an adequate assurance deposit in the amount of fifty percent (50%) of the Debtors' estimated average monthly costs for Utility Services; and (4) establishing procedures to object to the relief sought in the Utilities Motion. I understand that the proposed deposit is consistent with the amount required by the Bankruptcy Court in similar Chapter 11 cases in this District.

55. The Utility Services provided by the Utility Providers are crucial to the Debtors' continued operations and, thus, these Chapter 11 Cases. If the Utility Providers refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely (and potentially irreparably) disrupted. As a result, it is my belief that the relief requested in the Utilities Motion is critical for the continued, uninterrupted provision of Utility Services to the Debtors.

**D.** **Debtors' Application for an Order Appointing Omni Agent Solutions as Claims and Noticing Agent for the Debtors *Nunc Pro Tunc* to the Petition Date.**

56. The Debtors request entry of an order, pursuant to section 156(c) of title 28 of the United States Code, authorizing the retention and appointment of Omni Agent Solutions ("Omni") as claims and noticing agent in these Chapter 11 Cases (the "Omni Retention Application").

57. I believe that the relief requested in the Omni Retention Application will ease the administrative burden on the Clerk of the Bankruptcy Court in connection with these Chapter 11 Cases. Moreover, the Debtors have obtained and reviewed engagement proposals from two other

court-approved claims and noticing agents to ensure selection through a competitive process. Based on all engagement proposals obtained and reviewed, I believe that Omni's rates are competitive and reasonable given Omni's quality of service and expertise.

**E.**    **Application by Debtors for Order Approving Retention of Cozen O'Connor as Counsel to the Debtors.**

58.    The Debtors seek to employ and retain Cozen O'Connor ("Cozen") as their principal bankruptcy counsel to represent them as debtors-in- possession in these bankruptcy cases effective as of the Petition Date.  Accordingly, the Debtors respectfully request the entry of an order authorizing them to employ and retain Cozen as their attorneys under a general retainer to perform the legal services that will be necessary during these Chapter 11 Cases.

59.    The Debtors have selected Cozen because this case is likely to be complex and will require counsel to the Debtors with extensive experience in restructuring insolvent companies. Cozen has extensive experience and knowledge in the field of reorganization, restructuring, debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code.  In addition, Cozen has worked with the Debtors pre-petition and become familiar with the Debtors' businesses and affairs and many of the potential legal issues which may arise in the context of these Chapter 11 Cases.  Accordingly, the Debtors believe that Cozen is both well-qualified and able to assist it in these Chapter 11 Cases.

60.    The Debtors have selected Cozen because they believe Cozen is needed for the Debtors to properly perform their duties and functions while in bankruptcy; Cozen has extensive experience in matters of this character; and the Debtors believe that Cozen is well-qualified and uniquely able to represent them in these proceedings in an efficient and timely manner.

61.    The professional services which Cozen will provide to the Debtors include, but are not limited to, the following:

(a)    legal services with respect to the Debtors' powers and duties as a debtors-in-possession in continuing the management and operation of their businesses and properties;

(b)    appearing before this Court and any appellate courts, and protecting the interests of the Debtors' estates before such courts;

(c)    conferring with the United States Trustee to ensure compliance with all requirements overseen by the United States Trustee as part of the Chapter 11 process;

(d)    preparing necessary applications, motions, complaints, answers, responses, orders, reports, and other legal papers;

(e)    representing the Debtors in any matters involving disputes with secured and unsecured creditors;

(f)    attending meetings and negotiating with representatives of creditors or other parties in interest as required of the Debtors;

(g)    preparing a bankruptcy plan and disclosure statement and pursuing confirmation and approval thereof;

(h)    advising the Debtors in connection with any contemplated sales of certain assets;

(i)    taking actions to protect and preserve the Debtors' estates as necessary and as issues arise; and

(j)    performing all other legal services for the Debtors which may be necessary and herein.

**F.     Debtors' Motion for an Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief.**

62.     The Debtors seek entry of an order establishing procedures for interim compensation and reimbursement of expenses for retained professionals (the "Interim Compensation Procedures"). The Interim Compensation Procedures are described in detail in the Motion to approve same filed herewith. The Debtors believe that these procedures will streamline the administrative process for professional compensation for those professionals involved in the Debtors' cases, as well as enable the Court, the Office of the United States Trustee for the District of Delaware, and all other interested parties in these Chapter 11 ases to effectively monitor the fees and expenses incurred by professionals in connection with these cases.

63.     The Interim Compensation Procedures allow each professional to file a monthly fee application for interim allowance of compensation for services rendered and reimbursement of expenses incurred during the preceding month. The Interim Compensation Procedures further establish a procedure for objecting to such monthly applications, as well as authorization for the Debtors to pay the professionals 80% of fees and 100% of expenses of any requested monthly fees not subject to an objection.

64.     The Interim Compensation Procedures also set forth the procedures for such professionals to file interim fee applications in three-month intervals, and provide for a hearing on the interim fee applications every three months, allowing the Debtors to obtain Court approval to pay the professionals (including payment of the 20% holdback of any fees requested in the monthly applications).

**G.** **Debtors' Motion for Order (I) Authorizing (a) Payment of Pre-Petition Wages, Salaries and Employee Benefits, (b) Reimbursement of Employee Business Expenses, and (c) Payment of Other Employee Related Amounts; and (II) Authorizing Applicable Banks and Other Financial Institutions to Receive, Process, Honor and Pay All Checks and Drafts Drawn on Debtors' Bank Accounts Relating to the Foregoing.**

65.    The Debtors have requested that this Court enter an Order (I) authorizing (a) payment of pre-petition wages, salaries and employee benefits, (b) reimbursement of employee business expenses, and (c) payment of other employee-related amounts; and (II) authorizing applicable banks and other financial institutions to receive, process, honor and pay all checks and drafts drawn on debtors' bank accounts relating to the foregoing (the "Wage Motion"). The Wage Motion also includes a request for authority to honor any uncashed checks for wages paid to employees who were laid off shortly before the Petition Date.

66.    Regarding the Debtors' current employees, the continued maintenance of employee pay and benefits is essential to the ongoing and valued services of the Debtors' employees. Accordingly, the Debtors have sought authority to pay certain pre-petition obligations to their employees. These pre-petition obligations include various sums for: wages and salaries, federal and state withholding taxes, contributions to employee benefit plans and payment of health insurance claims and all other employee benefits that the Debtors pay in the ordinary course of business, as well as reimbursable expenses as defined in the Wage Motion (collectively, the "Employer Obligations"). Furthermore, as a service to its employees, the Debtors withhold certain amounts from their employees' paychecks for the benefit of designated recipients for various purposes, including, without limitation, the payment of wage garnishments. The Debtors withhold such amounts and pays them directly to the appropriate entity.

67.    As of the Petition Date, the Debtors' workforce consists of approximately 61 full-time employees, and approximately 176 part-time employees, all of whom receive their

compensation and benefits from Cosi, Inc. The Employees are not unionized. In order to ensure that their current employees are paid in the ordinary course when compensation payments become due, the Debtors have specifically requested that the order approving the Wage Motion also provide that the banks providing the accounts from which disbursements are authorized to service and administer the accounts as described above without interruption, and, in the usual and ordinary course of business, to receive, process, honor and pay any and all electronic or wire transfers, checks and drafts drawn on the Debtors' accounts, whether presented for payment before or after commencement of these Chapter 11 Cases by the holder thereof, provided that sufficient funds are in the Debtors' accounts to cover them.

68.    **Wages, Salaries and Compensation.** In the ordinary course of their business, the Debtors issue payroll checks on a bi-weekly basis. Employees are paid bi-weekly on Thursday for the two preceding weeks. Currently, all employees have been paid for the payroll period ending February 17, 2020. As of the Petition Date, the employees will not have been paid for the partial payroll period from February 18, 2020 through the Petition Date. Employees would normally be paid for this pay period on March 5, 2020.

69.    As of the Petition Date, the Debtors' gross bi-weekly payroll to all employees is approximately $345,000 (including payroll taxes). The March 5th payroll will include six pre-petition days and, therefore, the Debtors estimate that, from the March 5th payroll, approximately $147,857 (including payroll taxes) is scheduled to be paid on account of pre-petition wages and salaries.

70.    In the Wage Motion, the Debtors seek authority to pay the pre-petition wages and salaries in the ordinary course when due. The Debtors believe that these amounts are due and owing to the Debtors' employees for services rendered within the 180-day period immediately

preceding the Petition Date. Further, to the Debtors' knowledge, no employee is individually owed more than $13,650 on account of wages.

71.     In addition to pre-petition wages and salaries, the Debtors have incurred pre-petition obligations to former employees for accrued vacation and personal time off and have incurred pre-petition obligations to employees for vacation, holiday, sick leave, and severance pay. In the Wage Motion, the Debtors seek the authority, in their discretion, to pay former employees and employees to the extent that any amounts may be owed to them as it may become due.

72.     Although the Debtors seek authority to make the requested payments, they do not believe that the Court should direct them to pay any specific claim. Additionally, notwithstanding anything to the contrary, the payment of any claims pursuant to the Order approving the Wage Motion, if entered, shall neither (i) make such obligation an administrative expense of the Debtors' estates nor (ii) constitute approval by the Court of any employee plan or program including any bonus plans.

73.     **Employee Insurance Benefits.**  The Debtors maintain a self-insured group health insurance plan to provide employees with certain health insurance benefits (the "Self-Insured Plan") and the Debtors maintain other similar benefits such as dental, accidental death and dismemberment, short term disability and long term disability, and life insurance benefits (the "Employee Insurance Benefits"). The Self- Insured Plan provides that the Debtors are responsible for all covered claims up to a maximum of $100,000 per participant and an additional aggregate maximum limit of $50,000 per person for the plan year for the aggregate claims exceeding $100,000 per person for the plan year. Benefits paid in excess of these limits are reimbursed to the plan under a stop-loss policy. In addition, the Debtors have an aggregate stop-loss policy whereby the Debtors' liability for total claims submitted cannot exceed a pre-determined dollar

factor based upon, among other things, past years' claims experience, actual claims paid, the number of plan participants and monthly accumulated aggregate deductibles. The Debtors did not exceed this pre-determined maximum during fiscal year 2019. For the Debtors' 2020 plan year, this pre-determined dollar amount is approximately $1 million. Relief is sought simply to provide the Debtors authority to pay any amounts which may arise under the Debtors' Self-Insured Plan and other insurance benefits plans (although the Debtors will not be required to do so), and to continue to pay, in the ordinary course of business, the premiums for the insurance plans, including their stop-loss policies totaling approximately $12,500 per month and their other policies totaling approximately $4,800.

74.     Various insurance coverage is an important element of the Employee Insurance Benefits program. Employees and their families rely on the Debtors to provide continuing health care coverage. Any failure to pay these amounts would be injurious to employee welfare, morale and expectations. To the extent that any claims or premiums for Employee Insurance Benefits remain unpaid on the Petition Date or are submitted after the Petition Date for pre-petition periods, the Debtors seek authorization to pay those amounts.

75.     The Debtors also wish to honor the claims under the policy of both exiting and continuing employees and have budgeted for payment of such claims in the Chapter 11 operating budget. Specifically, the Debtors have budgeted in excess of $15,000 per bi-weekly pay period to satisfy such claims.

76.     **Pre-Petition Employee Benefits Withheld from Paychecks and Related Deductions.** The Debtors, as employers, are required by law to withhold federal, state, and local taxes from Wages (the "Employee Taxes") for remittance to appropriate tax authorities (the "Taxing Authorities"). In addition, the Debtors are required to pay social security and Medicare

taxes as well as additional amounts for state and federal unemployment insurance based on a percentage of gross payroll, subject to state-imposed limits (together with the Employee Taxes, the "Payroll Taxes").

77.    As of the Petition Date, the Debtors have accrued approximately $15,000 in Payroll Taxes. The Debtors seek authority to honor and process their pre-petition obligations with respect to the Payroll Taxes, including authority to pay Payroll Taxes to the Taxing Authorities, as needed.

78.    **Pre-Petition Reimbursable Expenses.** The Debtors reimburse Employees for certain ordinary course expenses incurred within the scope of Employees' employment, including travel, lodging, transportation, meals, and other miscellaneous expenses (collectively, the "Reimbursable Expenses"). Reimbursable Expenses incurred by Employees in furtherance of the Debtors' business are paid directly by Employees, who then submit expense reports to the Debtors in accordance with the Debtors' reimbursement policy. Some Employees may not yet have submitted expense reports for Reimbursable Expenses accrued shortly before the Petition Date. As of the Petition Date, the Debtors estimate that not more than approximately $15,000 may be outstanding on account of Reimbursable Expenses.

79.    Additionally, the Debtors provide certain Employees with corporate pre-funded credit cards (collectively, the "Expense Cards") that the Employees may use to directly charge the Debtors for certain ordinary-course business expenses. The Debtors typically add funds to the Expense Cards directly for anticipated charges. Because the Expenses Cards are pre-funded, as of the Petition Date, there are no outstanding charges on the Expense Cards. Accordingly, no pre-petition expenses will be paid using the Expense Cards.

80.    Failing to reimburse Employees for Reimbursable Expenses would have a negative effect on Employee morale, and would cause those employees with outstanding Reimbursable

Expenses to suffer undue hardship.  In addition, failing to pay the charges incurred using the Expense Cards could result in the card issuers denying further use of the Expense Cards, which could interrupt the ongoing operations of the Debtors.  Accordingly, the Debtors seek authority: (i) to continue pre-petition practices with respect to the Reimbursable Expenses and use of Expense Cards in the ordinary course of business; and (ii) to pay all pre-petition amounts outstanding in connection with the Reimbursable Expenses and Expense Cards.

81.    **Exit Store Layoffs**.  Regarding former employees of the Debtors, as noted above, immediately prior to the Petition Date, the Debtors identified the store locations with the most significant losses and closed those store locations (i.e.. the Exit Stores) and reduced their workforce accordingly.  As a result, in late December, 2019, the Debtors closed thirty locations and laid off a significant number of full and part time employees (i.e., the Exit Store Layoffs).  Most of the employees impacted by the Exit Store Layoffs were lower wage, hourly workers.  In addition, many worked part-time.  The Debtors provided each employee a final check for all services provided to the Debtors through the last date of service, inclusive of earned but unused paid time off (i.e., PTO).

82.    Most of the former employees impacted by the Exit Store Layoffs have already received payment of their final check via direct deposit.  Of those employees who received a paper check, the Debtors expect that many of the former employees impacted by the Exit Store Layoffs have already deposited and/or cashed their final checks.  However, to the extent that any such checks are currently working their way through the banking systems, the Debtors request authority for the banks holding their payroll accounts to honor the final checks paid to employees who were part of the Exit Store Layoffs.

**H.    Debtors' Motion for Entry of Order (I) Authorizing the Continued Use of Existing Cash Management System and Maintenance of Bank Accounts, and Waiving Certain Investment and Deposit Guidelines, (II) Authorizing Continued Use of Existing Business Forms and Checks and (III) Granting Related Relief.**

83.    The Debtors also have requested authority to continue to use certain pre-petition bank accounts, check stock and existing business forms as described below.  To service its operations, the Debtors have a comprehensive cash management system in place, which is reviewed and monitored by the Debtors' internal accounting staff.  If the Debtors were required to close existing bank accounts and open new accounts, there would likely be a meaningful disruption in the Debtors' ability to collect and disburse funds in the ordinary course of their operations.  As explained below, the Debtors use a centralized cash management system (the "Cash Management System") to collect and transfer funds from and for, and to pay expenses incurred by the Debtors.

84.    **Cash Management System.**  JPMorgan Chase Bank operates as the Debtors' central bank.  The central bank has a main operating account and four zero balance accounts (ZBAs), three of which are funded by the main operating account and one of which is funded by credit card sales via online catering sales, catering house account deposits, franchise royalty payments and three restaurant locations using Chase as their local depository bank (which are automatically transferred daily into the main operating account).  The Debtors also have 10 additional local depository bank accounts which are located in close proximity to each store to provide for timely daily deposits.  A listing of the Debtors' existing bank accounts is provided as Exhibit B to this Motion.

85.    The Debtors receive deposits from store sales, online catering sales, house accounts, third-party sales and franchisee royalties.  Funds from store sales are deposited in the local bank accounts or directly into the JPMorgan Chase operating account.  Funds from online catering sales and house accounts are deposited into the JPMorgan Chase depository accounts or

the JPMorgan Chase main operating account. Funds from in-store credit card sales through the Debtors' Square point of sale system are deposited into the location specific local bank depository accounts at Bank of America. Funds from third-party sales are deposited into a specified depository account at Bank of America. Deposits are made daily by the stores from the previous day's transactions. Online catering and house accounts tendered by Visa, MasterCard, American Express and Discover are settled into the Merchant Card depository ZBA and swept to the JPMorgan Chase main operating account daily. Monies deposited from the local banks are swept directly into a main operating account of each bank and then manually swept into the JPMorgan Chase main operating account bi-weekly. House account deposits and franchisee royalty payments are deposited when received and funded directly into the JPMorgan Chase main operating account.

86.    The Debtors maintain three (3) separate controlled disbursement ZBAs each related to payroll, manual payroll, and vendor disbursement (including rent and sales taxes) and funded by the main operating account. Payroll taxes are paid through the ADP funding account, and garnishments and 401(k) funds are pulled directly from the main operating account.

87.    All financial transactions are identified by different sequential numbers, tracked internally by the Debtors' accounting system and reconciled monthly. All discrepancies are researched immediately and brought to management's attention if needed.

88.    **Intercompany Transfers.** As noted previously, the Debtors operate on a fully consolidated basis and, therefore, they do not record intercompany transfers in the ordinary course. Although the Debtors have the ability to "recreate" transfers between corporate entities, such exercise would be extremely time-consuming and potentially unnecessary. The Debtors will consider at a later date whether to seek substantive consolidation of their estates.

89.    The Debtors are seeking authority to use the above described "cash management system" in the same manner as such accounts were used prior to the commencement of the Debtors' bankruptcy cases.

90.    **Existing Business Forms and Checks.**  In the ordinary course of business, the Debtors use pre-printed check stock with the relevant Debtor's name printed thereon.  In addition, the Debtors maintain pre-printed correspondence and business forms, including, but not limited to, letterhead, envelopes, promotional materials, and other business forms (collectively, along with the Debtors' checks, the "Business Forms").  To minimize administrative expense and delay, the Debtors request authority to continue to use their Business Forms substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' "Debtor-in-Possession" status.

I.    **Debtors' Motion for Interim and Final Orders Authorizing Payment of Certain Pre-Petition Taxes and Related Obligations.**

91.    In the normal course of their business, the Debtors collect sales, use, trust fund, and other similar taxes ("Sales and Use Taxes") from their customers and other third parties on behalf of the relevant taxing authorities (the "Taxing Authorities").  The Debtors hold these funds for the Taxing Authorities, and they are not estate property.

92.    The Debtors estimate that, as of the Petition Date, approximately $310,794.74 in collected but un-remitted Sales and Use Taxes are due and owing.  As of the Petition Date, the Debtors have incurred an additional sum for sales during the month of February, which they estimate will total approximately $137,000 for the month of February, representing Sales and Use Taxes that have been incurred pre-petition, but for which they have not yet been billed.  The Debtors are requesting authority to pay all Sales and Use Taxes, including without limitation those presently due and owing, and those for which they have not yet been billed.

93.     The Debtors' failure to pay the Sales and Use Taxes could have a material and adverse impact on their ability to operate in the ordinary course of business.

94.     Accordingly, the Debtors seek entry of an order authorizing, but not directing, the Debtors to pay any Sales and Use Taxes that are determined to be owed without regard to whether such obligations accrued or arose before or after the Petition Date.

**J.      Debtors' Motion for Entry of an Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers, and to Continue Certain Customer Programs.**

95.     The Debtors seek an Order authorizing the Debtors to honor or pay certain pre-petition obligations to its customers in the ordinary course of business (the "Motion to Honor Gift Cards and Customer Programs").

96.     Prior to the Petition Date and in the ordinary course of its business, the Debtors engaged in certain practices to maximize sales, engender customer loyalty, and develop and sustain brand loyalty and a positive reputation in the marketplace.  These practices include, but are not limited to, the following: (i) a gift card program (the "Gift Card Program"); (ii) a loyalty rewards program (the "Loyalty Program"); and (iii) coupons/discounts (the "Discount Program"; collectively with the Gift Card Program and the Loyalty Program, the "Customer Programs").

97.     The Customer Programs, which are commonplace among establishments similar to those operated by the Debtors, are described in detail in the Motion to Honor Gift Cards and Customer Programs.  The common goals of Customer Programs are to meet competitive pressures, ensure customer satisfaction, and generate brand loyalty and goodwill for the Debtors, thereby retaining current customers, attracting new ones, and ultimately improving the going concern value of the business.

98.     The Debtors wish to continue the Customer Programs post-petition in the ordinary course, which have been beneficial to their businesses (i.e., by honoring accrued rewards, pre

petition coupons and outstanding gift cards).[7]  Such relief is necessary to preserve the Debtors'

critical customer relationships and goodwill for the benefit of the estates.

99.     The Debtors have accounted for honoring extant Gift Cards, loyalty rewards, and

discounts in their budget and believe that maintaining the Customer Programs will preserve the

going concern value of the business.

**K.     Debtors' Omnibus Motion Seeking Entry of an Order (I) Authorizing (A) The
Rejection of Certain Unexpired Leases and (B) Abandonment of Certain Personal
Property, if Any, Each Effective Nunc Pro Tunc to the Petition Date and (II) Granting
Related Relief.**

100.    The Debtors seek an Order authorizing the Debtors to reject certain unexpired

leases (the "Motion to Reject Leases").

101.    As noted above, prior to the Petition Date, the Debtors identified certain restaurant

locations that were unprofitable and did not fit into the Debtors' go-forward strategy, and

subsequently closed approximately 30 locations (i.e., the Exit Stores).

102.    The Debtors are the counterparty to several leasing arrangements covering certain

real property formerly used in connection with their pre-petition operations at the Exit Stores (the

"Exit Leases").  In order to avoid any unnecessary administrative obligations which may arise

under the Bankruptcy Code, the Debtors seek authority to reject the Exit Leases as of the Petition

Date.  All of these stores were either unprofitable, geographically undesirable or subject to

overmarket leases.  The Debtors have ceased operations at the Exit Stores, and have either

completely or substantially vacated the premises and have returned (or are in the process of

---

[7]     As of the Petition Date, the Debtors estimate that customers had earned credits under the current Loyalty
Program worth up to approximately $445,990.  The Debtors anticipate that not all of these credits will be redeemed
during the pendency of the Chapter 11 Cases.  On average, approximately $25,000 in Loyalty Program credits are
redeemed per month.

As of the Petition Date, the amount of outstanding Gift Cards redeemable at the Debtors' locations totaled
approximately $1.4 million. However, approximately $1.3 Million of this total is from "stale" Gift Cards (i.e. gift
cards outstanding for more than 24 months).

returning) all keys. The Debtors have secured and removed personal property that, in their business judgment, had more than a de minimis value to the Debtors and their estates, and have sought the Court's approval to abandon any property thereafter remaining at the Exit Stores.

103.    The Debtors believe that the requested relief is vital to preserving the value of the estates.

**L.      The First Day Motions are Necessary and Appropriate.**

104.    As discussed above, I am familiar with the various types of relief requested in the Debtors' First Day Motions, including the proposed debtor-in-possession financing and all matters related to the Debtors' employees and, for the reasons set forth above, I believe that the relief requested in the First Day Motions is in the best interest of the Company and its creditors.

## III. CONCLUSION

105.    Accordingly, for the reasons stated herein, as well as set out in each of the first day applications and motions, the Debtors respectfully request that the First Day Motions be approved.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 24th day of February, 2020.

Vicki Baue
Vice President & General Counsel, Chief Compliance Officer (CCO) and Secretary