## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COSI, INC., *et al.*,[1] | ) | Case No. 20- |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS IN POSSESSION TO OBTAIN POSTPETITION SECURED SUPERPRIORITY FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION, (IV) SCHEDULING FINAL HEARING, AND (V) GRANTING CERTAIN RELATED RELIEF

Cosi, Inc. and its affiliated debtors (collectively, the "Debtors"), by and through its proposed counsel, hereby submit this motion (the "Motion"), pursuant to sections 105(a), 361, 362, 363, 364, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b) and 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order") and a final order (collectively, the "Orders") (i) authorizing the Debtors to obtain: senior secured superpriority postpetition financing; (ii) granting (a) liens and superpriority claims and (b) adequate protection to certain prepetition secured lenders; (iii) authorizing use of cash collateral; (iv) modifying the automatic stay; (v) scheduling a final hearing; and (vi) granting related relief. In support of this Motion, the Debtors rely upon and

---

[1] The Debtors in these Chapter 11 Cases are the following entities (the last four digits of each Debtor's respective federal tax identification number, if any, follow in parentheses): Cosi, Inc. (3745); Xando Cosi of Maryland, Inc. (2196); Cosi Sandwich Bar, Inc. (0910); Hearthstone Associates, LLC (6267); Hearthstone Partners, LLC (9433); Cosi Franchise Holdings LLC (6984); and Cosi Restaurant Holdings LLC (3461). The Debtors' corporate headquarters are located at 500 Rutherford Avenue, Suite 130, Charlestown, MA 02129.

incorporate by reference the *Declaration of Jason Fensterstock, Proposed Chief Restructuring Officer for the Debtors*, in support of this Motion and filed contemporaneously herewith.   In further support of this Motion, the Debtors respectfully state as follows:

1.    By this Motion, the Debtors request entry of the Orders, *inter alia*:

(a)    authorizing the Debtors to obtain secured postpetition superpriority financing (the "DIP Facility") on an interim basis pursuant to the terms and conditions of that certain *Secured Superpriority Debtor-in-Possession Term Credit Facility Term Sheet* dated as of February 24, 2020, by and among the Debtors and Lion Fund, LP (the "DIP Lender"), attached to the proposed form of interim order (as amended, supplemented, restated, or otherwise modified from time to time in accordance therewith, the "DIP Term Sheet," and together with the other documents, agreements, and instruments delivered pursuant thereto or executed or filed in connection therewith, as may be reasonably requested by the DIP Lender, as such may be amended, supplemented, restated, or otherwise modified from time to time, the "DIP Loan Documents");[2]

(b)    authorizing the Debtors to execute the DIP Loan Documents, and to perform such other acts as may be necessary or desirable in connection therewith;

(c)    granting an allowed superpriority claim to the DIP Lender;

(d)    granting to the DIP Lender security interests in and liens on the DIP Collateral (as defined below) pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code as set forth in the DIP Term Sheet to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Loan Documents, as applicable, and the Interim Order and the Final Order (as defined below), as applicable (collectively, the "DIP Loan Obligations");

(e)    authorizing the Debtors to use Cash Collateral (as defined below) (together with the DIP Facility, the "Postpetition Financing Arrangement");

(f)    authorizing the Debtors to grant adequate protection to (i) the holders (the "Secured Noteholders") of those certain *Subordinated DIP Rollup/Exit Promissory Notes* dated as of May 10, 2017, in the aggregate original outstanding

---

[2] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the DIP Term Sheet or the Orders.  To the extent there is any inconsistency between the terms of this Motion and the DIP Term Sheet or the Orders, the Orders, or if the matter is not addressed in the Orders, the DIP Term Sheet shall control.

principal amount not less than $6,678,459 (the "Rollup Secured Notes"), exclusive of accrued and accruing interest, fees, expenses, and other charges; and (ii) LIMAB LLC as Agent (the "Existing Lender Agent") for the lender parties (in their respective capacities as such, the "Existing Working Capital Lenders" and together with the Secured Noteholders, the "Existing Lenders" and together with the DIP Lender, the "Secured Parties") with regard to (A) that certain *Exit Credit Agreement* dated as of May 10, 2017 (as amended, restated, modified or supplemented from time to time, the "Exit Credit Agreement") in the aggregate outstanding principal amount not less than $23,882,795.81 exclusive of accrued and accruing interest, fees, expenses, and other charges; and (B) that certain *Bridge Priority Credit Agreement*, dated as of January 16, 2020 in the aggregate outstanding principal amount of $1,200,000 (the "Bridge Credit Agreement" and, together with the Exit Credit Agreement and the Rollup Secured Notes, the "Existing Secured Credit Facilities"), exclusive of accrued and accruing interest, fees, expenses, and other charges, and together with all agreements, documents, notes, mortgages, security agreements, pledges, guaranties, subordination agreements, instruments, amendments, and any other agreements and documents delivered pursuant thereto or in connection therewith, the "Existing Loan Documents"); and

(g)     scheduling a hearing (the "Final Hearing"), pursuant to Bankruptcy Rule 4001(c)(2), to consider entry of a final order (the "Final Order"), *inter alia*, approving and authorizing the Postpetition Financing Arrangement (including, without limitation, the advance under the DIP Facility contemplated by the Interim Order) on a final basis pursuant to the DIP Loan Documents;

2.     Pending the Final Hearing, the Postpetition Financing Arrangement will be implemented on an interim basis pursuant to the DIP Term Sheet, by and among the Debtors and the DIP Lender.

## SUMMARY OF KEY TERMS OF PROPOSED FINANCING

3.     Material provisions of the Postpetition Financing Arrangement are as follows:

(a)     Borrower.   Cosi, Inc. (the "Parent Borrower"), Hearthstone Partners, LLC, Hearthstone Associates, LLC, Xando Cosi Maryland, Inc., Cosi Sandwich Bar, Inc., Cosi Franchise Holdings LLC and Cosi Restaurant Holdings LLC, each in their respective capacities as a debtor and debtor-in-possession in jointly administered Chapter 11 Cases under the Bankruptcy Code in the Bankruptcy

Court (collectively, the "<u>Debtors</u>"), and all other subsidiaries of the Parent Borrower (collectively, the "<u>Borrower</u>").

(b)    <u>DIP Lender</u>.  Lion Fund, LP, subject to the satisfaction of all conditions set forth in the DIP Term Sheet and in the Orders, is providing a commitment for 100% of the DIP Facility.

(c)    <u>DIP Facility</u>.  The DIP Facility is a senior secured priming superpriority debtor-in-possession credit facility in a maximum principal amount of $3,000,000 (the "<u>Total Commitment</u>") consisting of:

(i)    A term loan commitment in a maximum principal amount of $1,250,000 (the "<u>Interim Order Term Loan Commitment</u>"), which shall be available upon entry of the Interim Order (the date of such entry, the "<u>Interim Order Date</u>").  On the Interim Order Date, the DIP Lender will make a single extension of credit (all extensions of credit under the DIP Facility are referred to as an "<u>Advance</u>") to the Borrower in the amount of the Interim Order Term Loan Commitment (such Advance, the "<u>Interim Order Date Term Loan</u>").

(ii)    A term loan commitment in a maximum principal amount of $1,750,000 (the "<u>Final Order Term Loan Commitment</u>") shall be available upon entry of the Final Order in three Advances to the Borrower, with the first Advance to be made in the amount of $750,000 on or before the date that is two (2) business days after entry of the Final Order, the second Advance to be made in the amount of $500,000 on or before May 31, 2020, and the third Advance to be made in the amount of $500,000 on or before August 15, 2020.

(d)    <u>Interest Rates</u>.  12.0% of the Advances, payable, in arrears, on the Maturity Date. At all times (i) following the Maturity Date or (ii) while any Event of Default exists, unpaid principal, interest and other amounts shall bear interest at a rate per annum equal to 2% in excess of the foregoing interest rate.

(e)    <u>DIP Fees</u>.  Lender shall receive both: (a) facility fee equal to 3.00% of the Total Commitment, which shall be deemed fully earned on the Closing Date and payable on the Maturity Date; and (b) an exit fee equal to 3.00% of the Total Commitment payable on the Maturity Date.

(f)    <u>Maturity Date</u>.  The DIP Facility shall mature, and all unpaid principal, interest, fees, costs, and expenses shall be immediately due and payable, on the earliest to occur of (a) the 10-month anniversary of the Interim Order Date (the "<u>Outside Date</u>"), (b) 30 days after the Petition Date if the Final Order has not been entered by that date, (c) the effective date of a Chapter 11 Plan that has been confirmed by an order of the Bankruptcy Court, (d) acceleration of the DIP Loan Obligations due to the occurrence of an Event of Default (subject to any right to cure, if such Event of Default provides for a cure period and is capable of cure), (e) the appointment of a Chapter 11 trustee or an examiner with expanded powers in any of the Chapter 11 Cases, (f) the conversion of any of the Chapter 11 Cases to a

case under Chapter 7 of the Bankruptcy Code, and (g) the dismissal of any of the Chapter 11 Cases.  The date on which the earliest of clauses (a) through (g) occurs is referred to as the "Maturity Date."  On the Maturity Date, the DIP Facility shall be deemed terminated and the DIP Lender shall have no further obligation to provide financing pursuant to the DIP Facility, the Orders or any DIP Loan Documents, other than to fund any then outstanding Carve-Out and the permission of the Existing Lenders and the Existing Lender Agent to the use of Cash Collateral shall be terminated.  All unpaid principal, interest, fees, costs and expenses under the DIP Facility shall be due and payable in full on the Maturity Date, whether at maturity, upon acceleration or otherwise.

(g)    Use of Proceeds.  The Advances will be used solely for (a) working capital and general corporate expenditures of the Debtors in accordance with the Approved Budget, (b) Bankruptcy Court approved professional fees and other administrative expenses arising in the Chapter 11 Cases in accordance with the Approved Budget, and (c) interest and reasonable fees and expenses (including professional fees) due under the DIP Loan Documents and incurred by the DIP Lender as provided by this Term Sheet, the DIP Loan Documents, or the Orders (in each case, whether or not such amounts are reflected in the Approved Budget).  The Debtors' use of all cash (whether or not from Advances) shall be subject to a weekly budget for the 13-week period commencing on the Petition Date and ending on June 1, 2020, in form and substance acceptable to, and approved in writing by, each of DIP Lender and the Existing Lender Agent in its sole and absolute discretion (the "Approved Budget").

(h)    Restrictions on Use of Advances and Cash Collateral.  None of the Advances and no Cash Collateral (defined below) shall be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings, contested matters or other litigation against the DIP Lender.  None of the Advances and no Cash Collateral shall be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings, contested matters or other litigation against the Existing Agent or the Existing Lenders, except up to the amount of $25,000 for an investigation (including any related discovery proceedings) by a specified party in interest (other than the Debtors) in connection with the validity and perfection of the liens granted under the Existing Secured Credit Facilities, as set forth in the Orders.

(i)    Security and Superpriority.  The DIP Loan Obligations shall be:

(i)    pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority claim status in the Chapter 11 Cases with priority over any and all administrative expenses, whether heretofore or hereafter incurred (including after any conversion of any of the Chapter 11 Cases to a case under chapter 7), of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code and, subject to entry of the Final Order, (but in all cases subject to the Carve-Out) (the "DIP Superpriority Claim");

      (ii)      pursuant to section 364(c)(2) of the Bankruptcy Code, secured by a perfected first-priority lien on the DIP Collateral (as defined below) to the extent that such collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date (but in all cases subject to the Carve-Out);

      (iii)     pursuant to section 364(c)(3) of the Bankruptcy Code, secured by a perfected second-priority lien on the DIP Collateral to the extent that such collateral is either (x) subject to a valid, perfected and non-avoidable first-priority lien in favor of third parties not affiliated with the Debtors (other than a first-priority lien under the Existing Secured Credit Facilities) in existence as of the Petition Date, or (y) subject to a valid and non-avoidable first-priority lien in favor of third parties not affiliated with the Debtors (other than a first-priority lien under the Existing Secured Credit Facilities) in existence as of the Petition Date that is perfected subsequent to such date to the extent permitted by section 546(b) of the Bankruptcy Code (but in all cases subject to the Carve-Out); and

      (iv)     pursuant to section 364(d) of the Bankruptcy Code, secured by a perfected first-priority, priming and senior security interest and lien granted to the DIP Lender (the "Priming DIP Liens," and together with the liens described in clauses (ii) and (iii) above, the "DIP Liens") in and on all the DIP Collateral to the extent that such collateral is subject to a first-priority lien under the Existing Secured Credit Facilities in existence as of the Petition Date (but in all cases subject to the Carve-Out). All existing liens, rights and interests granted to or for the benefit of the Existing Lenders, and all liens *pari passu* with, or subordinate thereto, in existence as of the Petition Date, shall be primed and made subject to and subordinate to the Priming DIP Liens (but in all cases subject to the Carve-Out).

      (v)      The DIP Liens shall not be subject to being treated *pari passu* with, or subordinated to, any other liens or security interests (whether currently existing or hereafter created), subject in each case only to (x) any first-priority liens in existence as of the Petition Date (other than a first-priority lien under the Existing Secured Credit Facilities) and (y) permitted exceptions to be expressly agreed upon in writing by the DIP Lender in its sole and absolute discretion (collectively, the "Permitted Liens").

(j)     DIP Collateral. "DIP Collateral" includes, without limitation, all of each Debtor's now or hereafter acquired right, title and interest in and to all cash, accounts, accounts receivable, commercial tort claims, general intangibles, payment intangibles, all intellectual property, inventory, equipment, owned real estate (if any, but excluding the leasehold interests themselves but including the economic value of or proceeds of sale or other disposition of, and any other proceeds and products of such leasehold interests), documents, instruments, deposit accounts, tax refunds, contract rights, chattel paper, investment property, letters of credit and letter-of-credit rights, money, fixtures, all intercompany claims, any and all

proceeds arising from insurance policies (including, without limitation, policies for the benefit of directors and officers of the Debtors) all claims and causes of action of the Debtors or their respective estates in the Chapter 11 Cases, and any and all proceeds, profits, and products therefrom (subject to entry of a final order with respect to Avoidance Actions), supporting obligations therefor and accessions thereto, and the equity interests of each direct and indirect subsidiary of the Parent Borrower, which "DIP Collateral," for the avoidance of doubt, shall include, without limiting the generality of the foregoing, all assets of any Debtor that are secured pursuant to the Existing Secured Credit Facilities.

(k)     <u>Cash Collateral</u>.  "Cash Collateral" shall mean and include all "cash collateral," as defined in section 363 of the Bankruptcy Code, in or on which the Existing Lenders hold a lien, security interest, or other interest (including, without limitation, any adequate protection liens or security interests) whether existing on the Petition Date, arising pursuant to this Interim Order, or otherwise and shall include, without limitation: (i) all cash proceeds arising from the collection, sale, lease, or other disposition, use, or conversion of any property, contracts, receivables or other payment rights, insurance policies, or other assets in or on which the Existing Lenders have a lien or a replacement lien, whether as part of the Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise, and whether such property has been converted to cash, existed as of the commencement of these Chapter 11 Cases, or arose or was generated thereafter; (ii) all of the respective deposits, refund claims, and rights in retainers of the Debtors on which the Existing Lenders have a lien or replacement lien, whether as part of the Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise; (iii) the proceeds of any sale of DIP Collateral or Prepetition Collateral in connection with any sale consummated prior to entry of the Final Order; and (iv) any and all other "cash proceeds" (as defined in the Uniform Commercial Code as enacted in the State of New York) of the DIP Collateral or the Prepetition Collateral, or of any proceeds thereof.

(l)     <u>Carve-Out</u>.  The term "<u>Carve-Out</u>" means, collectively:  (i) unpaid fees and expenses required to be paid by the Debtors to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a)(6); (ii) reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $25,000; (iii) to the extent allowed at any time and only up to the cumulative amounts for each such professional set forth in the Approved Budget (and only if the retention of such professional has been approved pursuant to a final order of the Bankruptcy Court), accrued and unpaid (net of any pre-petition retainers) reasonable fees, disbursements, costs, and expenses incurred at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined below) by any professionals retained by the Debtors or any official committee of unsecured creditors (the "<u>Committee</u>"), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice (collectively, the "<u>Professional Fees</u>"); and (iv) after the first business day following delivery by the DIP Lender of the Carve Out Trigger Notice, to the extent allowed at any time, Professional

Fees incurred after such date in an aggregate amount not to exceed $100,000 (the amount set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For the avoidance of doubt and notwithstanding anything to the contrary, the Carve-Out shall be senior to all claims and liens, including DIP Liens, as well as any adequate protection liens and claims described in the DIP Term Sheet.

(m)     <u>Adequate Protection</u>.  Upon entry of the Interim Order, as adequate protection, and in consideration for the consent of the Existing Lenders to (i) the use of Cash Collateral (as defined in the Interim Order) according to the Approved Budget, and (ii) the subordination of the liens granted under the Existing Secured Credit Facilities solely to the liens in the DIP Collateral in favor of the DIP Lender, the Existing Lenders shall receive (a) replacement liens and adequate protection pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code, in respect of the Existing Secured Credit Facilities, which shall be junior only to (i) the claims and liens of the DIP Lenders as described under "Security" above, and (ii) payment of the Carve-Out, and (b) a superpriority expense claim against all Debtors pursuant to section 507(b) of the Bankruptcy Code junior only to the superpriority claims under the DIP Facility and the Carve-Out, in each case to the extent of any diminution in value, and (c) all reasonable and documented postpetition fees and expenses of the Existing Lenders (in such capacity) and their counsel and other advisors incurred in connection with this Order or following the Petition Date up to, but not to exceed, the amounts budgeted therefor in the Approved Budget, which, for avoidance of doubt, shall be no more than $30,000 for each of March, April and May, 2020; provided that any such fees and expenses in excess of such amounts shall be considered as part of the Prepetition Adequate Protection Rights and an additional Adequate Protection Claim in this Order (it being understood that such Adequate Protection and the related Replacement Lien shall be subordinated in all respect to the DIP Obligations).

(n)     <u>Events of Default</u>.  Each of the following shall constitute an event of default under the DIP Facility (each an "Event of Default"): (i) failure to pay any interest, principal or fees when due under the DIP Facility; (ii) any representation or warranty is found to have been materially incorrect when made or deemed made; (iii) a net variance of more than the amount(s) set forth in the Budged Variance section of the DIP Term Sheet; (iv) breach of any other covenant, subject to customary notice and cure periods to be agreed; (v) conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (vi) dismissal of any of the Chapter 11 Cases that is without DIP Lender's written consent, in its sole discretion; (vii) the appointment of a Chapter 11 trustee or an examiner with expanded powers in any of the Chapter 11 Cases; (viii) the grant or existence of any superpriority expense claim or any lien which is pari passu with or senior to those of the DIP Lender (other than the Carve-Out and the Permitted Liens); (ix) the Bankruptcy Court's entry of an order granting relief from the automatic stay to permit foreclosure of security interests in any material assets of any Debtor; and (x) any reversal, revocation or modification without the written consent of DIP Lender in its sole and absolute discretion of (i) the Interim Order,

(ii) the Final Order or (iii) any other order of the Bankruptcy Court that could materially affect the DIP Facility in any manner adverse to the DIP Lender.

4.      The provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi) and Local Bankruptcy Rule 4001-2, to the extent applicable, are set out at the following sections of the DIP Term Sheet and the Interim Order:

(i)      ***Grant of priority or a lien on property of the estate***.  DIP Term Sheet, *Security and Superpriority*, pp. 4-5; Interim Order ¶¶ 7, 8.

(ii)     ***Adequate protection or priority for a claim that arose before the commencement of the case***.  DIP Term Sheet, *Adequate Protection*, p. 12; Interim Order, ¶ 9.

(iii)    ***Determination of validity, enforceability, priority or amount of a claim that arose before the commencement of the case, or of any lien securing the claim***.  Interim Order, ¶ D but subject to challenge rights in ¶ 13.

(iv)     ***Waiver or modification of the automatic stay***.  DIP Term Sheet, *Remedies*, p. 11; Interim Order, ¶ 16.

(v)      ***Waiver or modification of authority to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request use of cash collateral or request authority to obtain credit***.  Not Applicable.

(vi)     ***Establishment of deadlines for filing a plan, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order***.  Not Applicable.

(vii)    ***Waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien***.  DIP Term Sheet, *Security and Superpriority*, p. 5; Interim Order, ¶¶ 7(c), 20.

(viii)   ***Release, waiver or limitation on any claim or other cause of action belonging to the estate or the trustee.***  Interim Order, ¶¶ D (vi), 14, but subject to challenge rights in ¶13.

(ix)     ***Indemnification of any entity***.  DIP Term Sheet, *Expenses and Indemnity*, pp. 11-12.

(x)      ***Release, waiver, or limitation of any right under section 506(c)***.  Interim Order, ¶ 17.

(xi)    ***Liens granted on claims arising under Chapter 5***.  DIP Term Sheet, *DIP Collateral*, p. 7; Interim Order, ¶ 7.

## JURISDICTION

5.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.    The statutory bases for the relief requested in this Motion are sections 105(a), 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 2002-1(b) and 4001-2.

## BACKGROUND

7.    On the date hereof (the "Petition Date"), the Debtors each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Bankruptcy Court (the "Chapter 11 Cases").   On the Petition Date, the Debtors moved for an order of joint administration pursuant to Bankruptcy Rule 1015(b).  The Debtors remain in possession of their property and continue in the operation and management of their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

8.    The current shareholders of Cosi and their percentage ownership as of the Petition Date are (i) AB Opportunity Fund, LLC ("AB Opportunity Fund") (35.90%), (ii) AB Value Partners, L.P. ("AB Value Partners") (14.68%), (iii) AB Management LLC (36.92%) ("AB Management", and together with AB Value Partners and AB Opportunity Fund, the "AB Funds") and MILFAM II L.P. ("Milfam") (12.5%).  Two directors of the Debtors, Andrew Berger and David Polonitza, are affiliated with the AB Funds.

**A.**    **2017 Chapter 11 Cases**

9.    On September 28, 2016, the Debtors commenced cases under Chapter 11 of the Bankruptcy Code, which were jointly administered under Case No. 16-13704 (the "2017 Chapter 11 Cases") in the United States Bankruptcy Court for the District of Massachusetts (the "Massachusetts Bankruptcy Court").

10.    In connection with the commencement of the 2017 Chapter 11 Cases, funds affiliated with certain creditors of the Debtors (namely, Milfam, AB Value Partners and AB Opportunity Fund) provided debtor-in-possession financing to the Debtors as a bridge to a possible sale or reorganization.  On October 18, 2016, the Debtors and LIMAB LLC, a Delaware limited liability company ("LIMAB") that was controlled by Milfam, AB Value Partners and AB Opportunity Fund entered into that certain Asset Purchase Agreement which provided for the sale of substantially all of the Debtors' assets to LIMAB (as amended from time to time, the "APA").

11.    However, pursuant to and in connection with the APA, an election was made to consummate the sale as part of a chapter 11 plan of reorganization for the Debtors rather than a standalone sale pursuant to section 363 of the Bankruptcy Code.

12.    The Debtors emerged from bankruptcy as reorganized debtors pursuant to *the First Amended Joint Plan of Reorganization of Cosi, Inc., Xando Cosi of Maryland, Inc., Cosi Sandwich Bar, Inc., Hearthstone Associates, LLC, and Hearthstone Partners LLC* (the "2017 Plan"), which was confirmed by the Massachusetts Bankruptcy Court on April 25, 2017 and became effective on May 10, 2017 (the "2017 Effective Date").  The 2017 Chapter 11 Cases are concluded and have been closed by the Massachusetts Bankruptcy Court.

**B.      The Debtors' Debt Structure.**

13.      Upon emergence from the 2017 Chapter 11 Cases, and as authorized under the 2017 Plan and confirmation order, the shares of reorganized Cosi were distributed to the AB Funds and Milfam in exchange for their prepetition claims and the Debtors were obligated under two principal sets of secured debt instruments: (a) a senior secured exit credit agreement with LIMAB that was designed to provide amounts needed to fund emergence from chapter 11 and future working capital needs and (b) a series of "Subordinated DIP Rollup/Exit Promissory Notes" issued to Milfam, AB Value Partners, and AB Opportunity Fund, which represented the roll-up of outstanding obligations of the Debtors under their debtor-in-possession financing facility under the 2017 Chapter 11 Cases.

14.      More particularly, on the 2017 Effective Date, as provided in the 2017 Plan and confirmation order, the Debtors entered into the Exit Credit Agreement with LIMAB, as the Agent for the Existing Lenders.  The only Existing Lender under the Exit Credit Agreement is LIMAB.[3]  The initial borrowings under the Exit Credit Agreement, in the amount of approximately $5,525,000, were made on the 2017 Effective Date and were used to fund certain bankruptcy exit costs, including distributions to unsecured creditors and immediate working capital requirements.  Cosi, as borrower, and certain of its subsidiaries, as guarantors, secured all of their obligations under the Exit Credit Agreement by granting to the Agent, for the benefit of the secured parties under the Exit Credit Agreement, a first lien upon and security interests in all of their existing and after-acquired property.

15.      In addition, on the 2017 Effective Date, and pursuant to the 2017 Plan and confirmation order, Cosi incurred indebtedness in the original principal amount of

---

[3] The owners of LIMAB on the 2017 Effective Date were certain of the AB Funds and Milfam.

$6,678,459.12, in the form of secured rollup notes (the "<u>Rollup Notes</u>") which are subordinate only to the Exit Credit Agreement, that represented the rollup therein of the outstanding obligations of Cosi on the 2017 Effective Date under Cosi's debtor-in-possession loan facility in the 2017 Chapter 11 Cases.  The secured Rollup Notes were issued to Milfam, AB Value Partners, and AB Opportunity Fund.

16.     On January 16, 2020, as Cosi faced substantial liquidity challenges in light of a number of store closings in December 2019 and the need to prepare for a possible Chapter 11 filing, at the request of Cosi, the Agent, the Existing Lender, and Cosi entered into the Bridge Credit Agreement, pursuant to which the Existing Lender agreed to advance up to $1,200,000 of additional funds to Cosi in order to provide for immediate working capital needs by earmarking borrowings under such Bridge Credit Agreement for the payment of taxing authorities and other critical vendors or other creditor entities.

17.     As of the Petition Date, the outstanding principal amount of the loans under the Exit Credit Agreement was $23,882,795.81, consisting of (a) "Chapter 11 Closing Date Term Loans" in the aggregate principal amount outstanding of $5,525,000, (b) the "Converted Term Loan" in the aggregate principal amount outstanding of $4,790,000 (which amount represents revolving loans made under the Exist Credit Agreement on and after the 2017 Effective Date and converted into Term Loans pursuant to the Third Amendment to Exit Credit Agreement dated as of December 12, 2018), (c) "First Tranche Delayed Draw Term Loans" in the aggregate principal amount outstanding of $3,000,000, (d) "Third Amendment Term Loans" in the aggregate principal amount outstanding of $2,000,000, (e) "Fourth Amendment Term Loans" in the aggregate principal amount outstanding of $2,500,000, (f) "Fifth Amendment Initial Term Loans" in the aggregate principal amount of $2,000,000 (each of the terms in quotations as

defined in the Exit Credit Agreement), and (g) the capitalized accrued and unpaid interest of $4,067,795.81.  The various series of term loans made under the Exit Credit Agreement after the 2017 Effective Date represent loans made, at the request of Cosi, under various amendments to the Exit Credit Agreement from time to time in order to provide working capital that was required for the operation of the business as Cosi continued to face challenges.

18.    As of the Petition Date, the principal amount under the Rollup Notes (all of which were issued on the 2017 Effective Date) was $6,678,459.12 plus accrued and unpaid interest in the amount of approximately $1,816,123.39.  The Rollup Notes are currently held by the AB Funds.

19.    Further information regarding the Debtors' business, background, capital structure financial results and the events leading up to their bankruptcy filings can be found in the *Declaration of Vicki Baue in Support of the Debtors' Chapter 11 Petitions and First Day Relief*, which is incorporated herein by reference.

## Debtors' Proposed DIP Facility

### A.    Debtors' Need for Postpetition Financing

20.    The Debtors require the financing under the DIP Facility and the use of Cash Collateral (i) to maximize and preserve the value of their businesses while they attempt to consummate a plan of reorganization, (ii) to satisfy payroll obligations and other working capital and general corporate purposes of the Debtors consistent with the terms set forth in the DIP Loan Documents and the Approved Budget, (iii) to pay fees and expenses related to the DIP Loan Documents and these Chapter 11 Cases, and (iv) for such other purposes as are set forth in the DIP Loan Documents.  If the Debtors do not obtain authorization to borrow under the DIP Loan Documents, they will suffer immediate and irreparable harm.  After considering all alternatives,

the Debtors have concluded, in the exercise of their sound business judgment, that the Postpetition Financing Arrangement, including, without limitation, the financing pursuant to the DIP Term Sheet, represents the best financing available to them at this time.

21.    The proposed DIP Facility is reasonable and necessary.  Absent immediate and uninterrupted access to adequate financing, the Debtors will not have sufficient liquidity to sustain their business and maximize the value of the Debtors' assets.  In addition, without the DIP Facility, it would be impossible to continue operations and maintain enterprise value for any of the Debtors.  Among other things, the Cosi parent company provides all support for the Debtors' operations, including the valuable use of the Cosi brand.  As a stand-alone entity, without access to the Cosi brand and its support, the Debtors likely would be unable to raise the capital they need immediately to remain viable.

22.    In the months prior to the Petition Date, the Debtors took various steps to improve their financial performance.  The Debtors closed 30 unprofitable restaurant locations, and refocused on promoting the catering business and identifying the leasehold space and other overhead required to support that business.

23.    In addition, the Debtors retained a chief restructuring officer, Jason F. Fensterstock, (the "CRO") to assist with the development and implementation of the business plan.  The CRO has been fully engaged for the past 60 days reviewing and assessing all aspects of the Debtors' business from a bottoms-up perspective.  The CRO has identified numerous areas where additional cost cutting must occur, and those initiatives are underway.

24.    The Debtors believe that once those initiatives are implemented and take hold, the business can and will be profitable and poised to be sold or reorganized through a plan of reorganization.

25.     As a result, the Debtors, after consultation with their advisors and other professionals, and after due deliberation, determined that the best course of action under the circumstances would be to file a Chapter 11 petition to preserve the value of their business.

26.     The CRO, along with the Debtors' other officers, reached out to various parties prior to the Chapter 11 Cases in an effort to obtain debtor in possession financing.  Despite these efforts, and discussions with at least six other parties, the Debtors' efforts to secure financing on better terms were not successful.  Obtaining financing for these Debtors is especially challenging due to the nature of the Debtors' business, their performance over the last several years (including the fact of a prior chapter 11 case) and uncertainty over the ability to restructure the Debtors' business operations as currently contemplated.  These and other factors and risks, coupled with the relatively modest size of the required financing, make it extremely difficult to find a person willing to engage and perform diligence, and provide financing on reasonable terms, for these Debtors.

27.     As late as one week prior to the Petition Date, all efforts at finding financing had been unsuccessful and the Debtors faced the dire prospect of the need to file for chapter 11 without having any financing in place.  Ultimately, due to long standing historic business relationships between principals affiliated with the DIP Lender and one of the Debtors' directors, Andrew Berger, the DIP Lender was introduced to the Debtors, and the Debtors and its directors, officers and professionals (including the CRO) were able to negotiate the terms of the proposed facility with the DIP Lender and its professionals over the 72 hours leading up to the filing of the Debtors' petitions.

28.     Accordingly, the Debtors believe they are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503 of the Bankruptcy Code, or other

sufficient financing under section 364(c) or (d) of the Bankruptcy Code, on equal or more favorable terms than those set forth in the DIP Loan Documents, based on the totality of the circumstances.  A loan facility in the amount provided by the DIP Loan Documents is not available to the Debtors without granting the DIP Lender superpriority claims, liens, and security interests, pursuant to section 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, as provided in the Interim Order and the DIP Loan Documents.  After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the Postpetition Financing Arrangement, including, without limitation, the financing pursuant to the DIP Term Sheet, represents the best financing available to them at this time.

### B.      Negotiation of the DIP Facility and the Use of Cash Collateral

29.      The Debtors, the Existing Lenders and the DIP Lender engaged in extensive, arms' length negotiations with respect to the terms and conditions of the proposed DIP Facility and the use of Cash Collateral.  These negotiations culminated in agreement upon the proposed financing, including the DIP Term Sheet, attached hereto as **Exhibit B**.  Significantly, the DIP Term Sheet allows the Debtors to request the Advance of the Interim Order Term Loan Commitment from the DIP Lender, pending this Court's entry of the Final Order.  This interim commitment will ensure that the Debtors will be able to meet all of their administrative obligations during the early stages of these Chapter 11 Cases as well as provide adequate liquidity to operate their business.  Upon entry of the Final Order, the Debtors will be permitted to request Advances under the DIP Facility in an aggregate amount not to exceed the Total Commitment.  The Debtors and the DIP Lender have agreed upon the Approved Budget, projecting cash flow for the expected duration of this case.  The Approved Budget contemplates that the Debtors will have use of Cash Collateral during that time.  The Debtors believe that the

Approved Budget is achievable and will allow the Debtors to operate without the accrual of unpaid administrative expenses.

### C. Adequate Protection for the Prepetition Secured Lenders

30.    The Debtors' ordinary course operations generate Cash Collateral through the sale of food and related items.  The Debtors also generate receivables that are ultimately converted into cash from the catering business and franchise relationships.  One of the Debtors' pressing concerns is the need for the immediate use of Cash Collateral pending a final hearing on the DIP Motion.  The Debtors require the use of Cash Collateral in order to meet their expenses and maintain the operation of their business.  Without the use of Cash Collateral, the Debtors' operations will be substantially and irreparably harmed.  The continued operation of the Debtors' business is essential to their operation during this case.  In order to avoid immediate and irreparable harm to the Debtors' estates, the Debtors require the use of Cash Collateral to pay, among other things, payroll, utilities, taxes, insurance, and other ordinary business costs and expenses.

31.    The Existing Lenders have security interests in substantially all of the Debtors' Cash Collateral. As adequate protection for, among other things, any interest in Cash Collateral which the Existing Lenders may have as well as the incurrence of the Priming DIP Loan Obligations, the granting of the DIP Liens and DIP Superpriority Claims, the Debtors are willing and submit it necessary and appropriate to grant the Existing Lenders replacement liens in the Debtors' post-petition Cash Collateral and all other assets of the Debtors, subject only to the liens of the DIP Lender and the Carve-Out, with such replacement liens having the same extent, priority and validity as their pre-petition liens on the Cash Collateral, and only to the extent that

the Debtors use such Cash Collateral. The proposed replacement liens should provide sufficient adequate protection to prevent any diminution in value to the Existing Lenders' Cash Collateral.

32.     The Existing Lenders are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interests in collateral, including Cash Collateral to the extent that there is a diminution in the value of such collateral from and after the Petition Date.

33.     The Debtors seek to grant liens and claims, as more fully described and set forth in the proposed Interim Order, to be made to the Existing Lenders for the purpose of, among other things, protecting the Existing Lenders' claims, obligations, and collateral interests from the potential depreciation and deterioration of such collateral.

## RELIEF REQUESTED

34.     The Debtors request that the Court authorize the Debtors, as debtors and debtors-in-possession, to use Cash Collateral and to obtain senior secured, super-priority, postpetition financing up to an aggregate principal amount of $3,000,000, pursuant to the DIP Term Sheet, from the DIP Lender pursuant to the terms of this Motion, the Orders and the DIP Term Sheet.

35.     Pending the entry of the Final Order, the Debtor requests that the Court authorize it, on an interim basis, (i) to borrow up to $1,250,000 under the DIP Term Sheet, (ii) to grant to the DIP Lender the liens and superpriority claims described herein, (iii) to provide adequate protection in favor of the Existing Lenders, as described herein and in the Interim Order, (iv) approve the proposed notice of the Final Hearing and the adequacy of the proposed service thereof and (v) schedule the Final Hearing.

## BASIS FOR REQUESTED RELIEF

### The DIP Term Sheet and Use of Cash Collateral Should Be Authorized

36.     Approval of the DIP Term Sheet and the authorization for the use of Cash Collateral will provide the Debtors with immediate and ongoing access to cash to ensure payment of their current and ongoing operating expenses, for the anticipated duration of these Chapter 11 cases.  Without authorization to enter into the DIP Term Sheet and to use Cash Collateral, the Debtors would experience deterioration in customer and/or vendor confidence as such constituencies may harbor doubt with respect to the Debtors' liquidity and ability to emerge from this Chapter 11 case as a viable enterprise.  The credit provided under the DIP Term Sheet will help enable the Debtors to operate their business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all parties in interest.  Without the proposed financing and use of Cash Collateral, the Debtors would be forced to shut down their operations and liquidate their assets.  Thus, the implementation of the DIP Term Sheet and authorization to use Cash Collateral will maximize value for the Debtors' estates.  Accordingly, the timely approval of the relief requested herein is imperative.

37.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364.  The Debtors propose to provide, among other things, superpriority claims, security interests, and liens pursuant to sections 364(c)(1), (2), (3) and (d) of the Bankruptcy Code.

38.     The Debtors' goal of a successful reorganization under a Chapter 11 plan can be achieved only if the Debtors are immediately authorized to use Cash Collateral and to borrow up to $1,250,000 under the DIP Term Sheet and to use such proceeds to operate its business.  The Debtors have been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b), or in exchange for the grant of a superpriority claim pursuant to section 364(c)(1).  The Debtors made reasonable inquiries with potential lenders, and have not been able to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

39.     The Debtors negotiated with the DIP Lender extensively and at arms' length.  Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith.  *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores. Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.*, 47 B.R. 444,449 (D. Colo. 1985).

40.     Furthermore, section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien.  *In re Snowshoe Co.*, 789 F.2d

at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re 495 Central Park Ave Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position").

41.     The terms and conditions of the DIP Term Sheet are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arms' length.  Accordingly, the DIP Lender and all obligations incurred under the DIP Term Sheet should be accorded the benefits of section 364(e) of the Bankruptcy Code.

## The Proposed Adequate Protection Should Be Authorized

42.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used by a debtor-in-possession, the court. . . shall prohibit or condition such use. . . as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief.  11 U.S.C. § 361.  What constitutes adequate protection must be decided on a case-by-case basis.  *See In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985).  The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use.  *See In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); *Delbridge v. Production Credit Assoc. and Federal Land Bank*, 104 B.R. 824 (E.D. Mich. 1989); *In re Leduemere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990).

43.     In addition, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on encumbered property if the

debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected. *See* 11 U.S.C. § 364(d)(1). Specifically, section 364(d)(1) of the Bankruptcy Code provides:

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if: (A) the trustee is unable to obtain such credit otherwise; and (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

44.    "Section 364(d) 'does not require that debtors seek alternative financing from every possible lender. However, the debtor must make an effort to obtain credit without priming a senior lien.'" *In re Republic Airways Holdings Inc.*, 2016 WL 2616717, at *11. Consent by secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). What constitutes adequate protection is decided on a case-by-case basis. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); *In re N.J. Affordable Homes Corp., No. 05-60442 (DHS)*, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("The term 'adequate protection' is intended to be a flexible concept."); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (emphasizing that "the varying analyses and results contained in the . . . slew of cases demonstrate that what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis").

45.    The Existing Lenders have agreed to the Debtors' entry into the DIP Term Sheet in consideration for the adequate protection provided to them under the DIP Term Sheet.

Moreover, the replacement liens, cash payments and other protections offered to the Existing Lenders will sufficiently protect their interest in any collateral, including Cash Collateral, taken as security under the Existing Credit Facilities. Accordingly, the adequate protection proposed here, including granting of liens on unencumbered collateral, is fair and reasonable and sufficient to satisfy the requirements of Bankruptcy Code sections 363(c)(2) and (e) and 364(d)(1).

## The Automatic Stay Should Be Modified on a Limited Basis

46.    The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to (i) grant the security interests, liens, and superpriority claims described above with respect to the DIP Lender, as the case may be, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) permit the DIP Lender to exercise, upon the occurrence and during the continuance of an event of default and after five business days' notice thereof, all rights and remedies under the DIP Term Sheet; and (iii) implement the terms of the proposed interim and final orders.

47.    Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

## Interim Approval Should Be Granted

48.    Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing. The Debtors request that the Court conduct an expedited preliminary hearing on this motion and (a) authorize the

Debtors to use Cash Collateral and to borrow up to $1,250,000 under the DIP Term Sheet on an interim basis, pending entry of a final order, in order to (i) maintain, finance and ensure the ongoing operations of the Debtors, and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest and (b) schedule a hearing to consider entry of a final order.

49.      The availability of Interim Order Date Term Loan under the DIP Term Sheet will provide the Debtors with the ability to meet their near-term obligations.  Failure to meet these obligations likely would have a long-term negative impact on the value of their business, to the detriment of all creditors and parties in interest.  Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors.

## NOTICE

50.      Notice of this Motion will be given to the following parties, or in lieu thereof, to their counsel: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the twenty (20) largest unsecured claims against the Debtors (on a consolidated basis); (c) the Debtors' pre and post-petition secured lenders; (d) the Securities and Exchange Commission; and (e) the Internal Revenue Service.  As the Motion is seeking "first day" relief, within two (2) business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered with respect to the Motion in accordance with the Local Rules. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

51.      No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully requests entry of the attached order granting the relief sought herein and granting such other and further relief as is just.

Dated:  February 24, 2020                COZEN O'CONNOR


                                          */s/ Mark E. Felger*
                                          Mark E. Felger (No. 3919)
                                          1201 N. Market St., Ste. 1001
                                          Wilmington, DE  19801
                                          Telephone:  (302) 295-2000
                                          Facsimile:  (302) 295-2013
                                          Email:  mfelger@cozen.com

                                          *Proposed Counsel for the Debtors and*
                                          *Debtors in Possession*