# COSI, INC.

## SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION TERM CREDIT FACILITY

## TERM SHEET

### Dated as of February 24, 2020

*This term sheet (the "Term Sheet") and the Orders (as defined below) authorizing the Debtors to incur credit pursuant to this Term Sheet reflect the terms of the proposed debtor-in-possession financing (the "DIP Facility") and related accommodations. The DIP Lender's commitment to provide the DIP Facility is subject to (a) entry and effectiveness of the Orders and (b) the conditions set forth herein and in the Orders.*

## TERMS OF DIP FACILITY AND ADEQUATE PROTECTION

In the event that Cosi, Inc. and certain of its direct and indirect subsidiaries determine to file a petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") for the purpose of, among other objectives, confirming a Chapter 11 plan of reorganization (a "Chapter 11 Plan"), the following describes the terms of a DIP Facility to be used to fund working capital during the pendency of the Chapter 11 cases (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

The terms and conditions for the extension of credit described in this Term Sheet are dependent upon, among other things, authorization and approval by the Bankruptcy Court. The terms and conditions with respect to such commitments are mutually dependent on each other, and the DIP Lender shall not be obligated to extend credit unless, among other conditions, approval by the Bankruptcy Court is obtained with respect to such terms and conditions as a whole.

| | |
|---|---|
| **Borrower:** | Cosi, Inc. (the "Parent Borrower"), Hearthstone Partners LLC, Hearthstone Associates, LLC, Xando Cosi Maryland, Inc., Cosi Sandwich Bar, Inc., Cosi Franchise Holdings LLC, Cosi Restaurant Holdings LLC, each in their respective capacities as a debtor and debtor-in-possession in jointly administered Chapter 11 Cases under the Bankruptcy Code in the Bankruptcy Court (collectively, the "Debtors"), and all other subsidiaries of the Parent Borrower (collectively, the "Borrower"). |
| **DIP Lender:** | Lion Fund, LP (the "DIP Lender") shall, subject to the satisfaction of all conditions set forth herein and in the Orders, provide commitments for 100% of the DIP Facility. |
| **Existing Secured Indebtedness:** | (A) That certain *Exit Credit Agreement* dated as of May 10, 2017 (as amended, restated, modified or supplemented from time to time, the "Exit Credit Agreement") by and among the Parent Borrower and LIMAB LLC as Agent (the "Existing Lender Agent") for the several institutions party thereto (in their respective capacities as such, the "Existing Lenders"); (B) those |

|                  |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                 |
|------------------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                  | certain "*Subordinated DIP Rollup/Exit Promissory Notes*" dated as of May 10, 2017 in the aggregate original outstanding principal amount of $6,678,459 (the "Subordinated Secured Notes"); and (C) that certain *Bridge Priority Credit Agreement*, dated as of January 16, 2020 (the "Bridge Credit Agreement") in the aggregate outstanding principal amount of [$1,200,000], by and among the Parent Borrower and the Existing Lenders. Collectively, the Exit Credit Agreement, the Subordinated Secured Notes and the Bridge Credit Agreement are referred to herein as the "Existing Secured Credit Facilities". The Existing Lender Agent, the Existing Lenders and the holders of the Subordinated Secured Notes shall consent to the terms of the DIP Facility reflected in this Term Sheet, including the priming of the liens securing the Existing Secured Credit Facilities contemplated below, it being understood that nothing in this term sheet shall constitute the consent of the Existing Lender Agent, the Existing Lenders and the holders of the Subordinated Secured Notes to any other debtor-in-possession or other financing facility except for the DIP Facility under this Term Sheet. |
| **Interim Order:** | An order of the Bankruptcy Court shall have been entered approving the DIP Facility, and authorizing the Debtors to incur the Interim Order Date Term Loan (as defined below), which order shall be subject to the written approval as to form and content by each of DIP Lender and the Existing Lender Agent in its sole and absolute discretion (the "Interim Order"). |
| **Final Order:** | A final order of the Bankruptcy Court approving the DIP Facility, which order shall be subject to the written approval as to form and content by each of DIP Lender and the Existing Lender Agent in its sole and absolute discretion (the "Final Order," and together with the Interim Order, the "Orders"). |
| **DIP Facility:** | • A senior secured priming superpriority debtor-in-possession credit facility in a maximum principal amount of $3,000,000 (the "Total Commitment") that will consist of:<br><br>(i) A term loan commitment in a maximum principal amount of $1,250,000 (the "Interim Order Term Loan Commitment") shall be available upon entry of the Interim Order (the date of such entry, the "Interim Order Date"). On the Interim Order Date, DIP Lender will make a single extension of credit (all extensions of credit under the DIP Facility are referred to herein as an "Advance") to the Borrower in the amount of the Interim Order Term Loan Commitment (such Advance, the "Interim Order Date Term Loan").<br><br>(ii) A term loan commitment in a maximum principal amount of $1,750,000 (the "Final Order Term Loan Commitment") shall be available upon entry of the Final Order in three Advances to the Borrower, with the first Advance to be made in the amount of $750,000 on or before the date that is two (2) business days after entry of the Final Order, the second Advance to be made in the amount of $500,000 on or before May 31, 2020, and the third Advance to be made in the amount of $500,000 on or before August 15, 2020.<br><br>• In order to request an Advance under the Final Order Term Loan |

|  |  |
|---|---|
|  | Commitment, Borrower shall provide DIP Lender with a Borrowing Request (as defined below) at least three (3) business days in advance of the requested funding date. The making of an Advance under the Final Order Term Loan Commitment shall be subject to DIP Lender's sole, reasonable determination that the conditions to borrowing hereunder have been satisfied. |
|  | • All Advances shall be subject to the terms and conditions set forth herein and in the Orders, and shall be in compliance with the Approved Budget (as defined below). The Borrower may not repay the Advances in whole or in part until the Maturity Date (as defined below). The Advances may, at the option of DIP Lender, be evidenced by a promissory note in form and substance satisfactory to DIP Lender in its sole and absolute discretion (each, a "<u>Note</u>") and upon the request of DIP Lender, Borrower shall execute and deliver a Note(s) to DIP Lender. Each Advance shall be made by wire transfer of immediately available funds to a post-petition debtor-in-possession deposit account of Borrower which shall be deemed, pursuant to each of the Orders, subject to the "control" of the DIP Lender as that term is defined under the Uniform Commercial Code as enacted in the state of the depositary bank's jurisdiction. |
|  | • The Approved Budget shall be a cash flow budget and shall be in form and substance consistent with the budget attached hereto as **Exhibit 1**, with adjustments thereto reflecting differences in the timing of receipts and disbursements resulting from the actual commencement date of the Chapter 11 Cases (the "<u>Petition Date</u>") and the date such disbursements are approved by the Court (if approval is necessary), or such other adjustments as may otherwise be approved by DIP Lender in writing in its sole and absolute discretion. |
|  | • This Term Sheet and all instruments, agreements and documents that may be executed or delivered at any time in connection with the DIP Facility shall be referred to collectively as the "<u>DIP Loan Documents</u>." |
|  | • The Debtors shall use a cash management system that is the same as or substantially similar to its prepetition cash management system. Any material changes from such prepetition cash management system must be acceptable to, and approved in writing by, the DIP Lender in its sole and absolute discretion. |
|  | • The date on which the Interim Order Date Term Loan is funded is referred to as the "<u>Closing Date</u>." |
| **Use of Proceeds:** | The Advances will be used solely for (a) working capital and general corporate expenditures of the Debtors in accordance with the Approved Budget, (b) Bankruptcy Court approved professional fees and other administrative expenses arising in the Chapter 11 Cases in accordance with the Approved Budget, and (c) interest and reasonable fees and expenses (including professional fees) due under the DIP Loan Documents and incurred by the DIP Lender as provided by this Term Sheet, the DIP Loan Documents, or the Orders (in each case, whether or not such amounts are reflected in the Approved Budget).<br><br>The Debtors' use of all cash (whether or not from Advances) shall be subject |

to a weekly budget for the 13-week period commencing on the Petition Date and ending on June 1, 2020, in form and substance acceptable to, and approved in writing by, each of DIP Lender and the Existing Lender Agent in its sole and absolute discretion (the "Approved Budget").

None of the Advances and no Cash Collateral (defined below) shall be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings, contested matters or other litigation against the DIP Lender.

None of the Advances and no Cash Collateral shall be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings, contested matters or other litigation against the Existing Lenders, except up to the amount of $25,000 for an investigation (including any related discovery proceedings) by a specified party in interest (other than the Debtors) in connection with the validity and perfection of the liens granted under the Existing Secured Credit Facilities, as set forth in the Orders.

**Security and Superpriority:** The DIP Facility and all other obligations of the Debtors to the DIP Lender under or in connection with this Term Sheet, the DIP Loan Documents, or the Orders (collectively, the "DIP Obligations"), shall be:

(i) pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority claim status in the Chapter 11 Cases with priority over any and all administrative expenses, whether heretofore or hereafter incurred (including after any conversion of any of the Chapter 11 Cases to a case under chapter 7), of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code and, subject to entry of the Final Order, (but in all cases subject to the Carve-Out);

(ii) pursuant to section 364(c)(2) of the Bankruptcy Code, secured by a perfected first-priority lien on the DIP Collateral (as defined below) to the extent that such collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date (but in all cases subject to the Carve-Out);

(iii) pursuant to section 364(c)(3) of the Bankruptcy Code, secured by a perfected second-priority lien on the DIP Collateral to the extent that such collateral is either (x) subject to a valid, perfected and non-avoidable first-priority lien in favor of third parties not affiliated with the Debtors (other than a first-priority lien under the Existing Secured Credit Facilities) in existence as of the Petition Date, or (y) subject to a valid and non-avoidable first-priority lien in favor of third parties not affiliated with the Debtors (other than a first-priority lien under the Existing Secured Credit Facilities) in existence as of the Petition Date that is perfected subsequent to such date to the extent permitted by section 546(b) of the Bankruptcy Code (but in all cases subject to the Carve-Out); and

(iv) pursuant to section 364(d) of the Bankruptcy Code, secured by a perfected first-priority, priming and senior security interest and

lien granted to the DIP Lender (the "Priming DIP Liens," and together with the liens described in clauses (ii) and (iii) above, the "DIP Liens") in and on all the DIP Collateral to the extent that such collateral is subject to a first-priority lien under the Existing Secured Credit Facilities in existence as of the Petition Date (but in all cases subject to the Carve-Out). All existing liens, rights and interests granted to or for the benefit of the Existing Lenders, and all liens *pari passu* with, or subordinate thereto, in existence as of the Petition Date, shall be primed and made subject to and subordinate to the Priming DIP Liens (but in all cases subject to the Carve-Out).

The DIP Liens shall not be subject to being treated *pari passu* with, or subordinated to, any other liens or security interests (whether currently existing or hereafter created), subject in each case only to (x) any first-priority liens in existence as of the Petition Date (other than a first-priority lien under the Existing Secured Credit Facilities) and (y) permitted exceptions to be expressly agreed upon in writing by the DIP Lender in its sole and absolute discretion (collectively, the "Permitted Liens").

All DIP Liens, and all liens authorized and granted as adequate protection as described below and approved by the Bankruptcy Court, shall be deemed effective and perfected for all purposes pursuant to the Orders as of the Petition Date, and no further filing (including the filing of any UCC financing statement, any filing in the U.S. Patent and Trademark Office, any filing in the U.S. Copyright Office, or any filing in any other U.S. or foreign office or registry), recordation, possession, notice or act will be required to effect such perfection.

The term "Carve-Out" means, collectively: (i) unpaid fees and expenses required to be paid by the Debtors to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a)(6); (ii) reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $25,000; (iii) to the extent allowed at any time and only up to the cumulative amounts for each such professional set forth in the Approved Budget (and only if the retention of such professional has been approved pursuant to a final order of the Bankruptcy Court), accrued and unpaid (net of any pre-petition retainers) reasonable fees, disbursements, costs, and expenses incurred at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined below) by any professionals retained by the Debtors or any official committee of unsecured creditors (the "Committee"), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice (collectively, the "Professional Fees"); and (iv) after the first business day following delivery by the DIP Lender of the Carve Out Trigger Notice, to the extent allowed at any time, Professional Fees incurred after such date in an aggregate amount not to exceed $100,000 (the amount set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").

For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by the DIP Lender (which delivery shall be made via electronic mail and overnight delivery) to the Debtors and their counsel, the

United States Trustee, and lead counsel to any Committee, which notice may only be delivered following the occurrence and during the continuance of an Event of Default (as defined below), or following the occurrence of the Maturity Date, and stating that the Post-Carve Out Trigger Notice Cap has been invoked.

For the avoidance of doubt, to the extent that Advances are made under the DIP Facility on account of Professional Fees set forth in the Approved Budget, such Advances shall be deemed to correspondingly reduce the Carve-Out, whether or not such funds are disbursed to or for the benefit of such professionals. The Debtors and the DIP Lender shall agree on mutually satisfactory arrangements to reserve Advances made on account of the Carve-Out for Professional Fees pending approval of the Bankruptcy Court to disburse such amounts to the beneficiaries of the Carve-Out.

For the avoidance of doubt and notwithstanding anything to the contrary herein or elsewhere, the Carve-Out shall be senior to all claims and liens, including DIP Liens, as well as any adequate protection liens and claims described herein.

**Maturity Date:** The DIP Facility shall mature, and all unpaid principal, interest, fees, costs, and expenses shall be immediately due and payable, on the earliest to occur of (a) the 10-month anniversary of the Interim Order Date (the "Outside Date"), (b) 30 days after the Petition Date if the Final Order has not been entered by that date, (c) the effective date of a Chapter 11 Plan that has been confirmed by an order of the Bankruptcy Court, (d) acceleration of the DIP Obligations due to the occurrence of an Event of Default (subject to any right to cure, if such Event of Default provides for a cure period and is capable of cure), (e) the appointment of a Chapter 11 trustee or an examiner with expanded powers in any of the Chapter 11 Cases, (f) the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, and (g) the dismissal of any of the Chapter 11 Cases. The date on which the earliest of clauses (a) through (g) occurs is referred to as the "Maturity Date."

On the Maturity Date, the DIP Facility shall be deemed terminated and the DIP Lender shall have no further obligation to provide financing pursuant to the DIP Facility, the Orders or any DIP Loan Documents, other than to fund any then outstanding Carve-Out. All unpaid principal, interest, fees, costs and expenses under the DIP Facility shall be due and payable in full on the Maturity Date, whether at maturity, upon acceleration or otherwise.

Any confirmation order entered in the Chapter 11 Cases shall not discharge or otherwise affect in any way any of the joint and several obligations of the Borrower under the DIP Facility, the Orders or the DIP Loan Documents, other than after the payment in full in cash of all obligations under the DIP Facility, the Orders and the DIP Loan Documents on or before the effective date of a plan of reorganization and the termination of the Total Commitment.

**Interest Rates:** 12.0% of the Advances, payable, in arrears, on the Maturity Date. At all times (i) following the Maturity Date or (ii) while any Event of Default exists, unpaid principal, interest and other amounts shall bear interest at a rate per

|  |  |
|---|---|
|  | annum equal to 2% in excess of the foregoing interest rate. |
| **DIP Fees:** | DIP Lender shall receive both: (a) a facility fee equal to 3.00% of the Total Commitment, which shall be deemed fully earned on the Closing Date and payable on the Maturity Date; and (b) an exit fee equal to 3.00% of the Total Commitment payable on the Maturity Date. |
| **DIP Collateral:** | "DIP Collateral" means, collectively, all now owned or hereafter acquired assets and property of each Debtor and its respective chapter 11 estate, whether real or personal, tangible or intangible, existing or after-acquired, and any and all proceeds therefrom, including, without limiting the generality of the foregoing, all cash, accounts, accounts receivable, commercial tort claims, general intangibles, payment intangibles, all intellectual property, inventory, equipment, real estate, documents, instruments, deposit accounts, tax refunds, contract rights, chattel paper, investment property, letters of credit and letter-of-credit rights, money, fixtures, leasehold interest, all intercompany claims, any and all proceeds arising from insurance policies (including, without limitation, policies for the benefit of directors and officers of the Debtors) all claims and causes of action of the Debtors or their respective estates in the Chapter 11 Cases, and any and all proceeds, profits, and products therefrom, supporting obligations therefor and accessions thereto, subject to entry of the Final Order, and the equity interests of each direct and indirect subsidiary of Parent Borrower, which "DIP Collateral," for the avoidance of doubt, shall include, without limiting the generality of the foregoing, all assets of any Debtor that are secured pursuant to the Existing Secured Credit Facilities. |
| **Initial Conditions Precedent:** | The making of the Interim Order Date Term Loan is subject to the satisfaction of the following conditions precedent:<br><br>• DIP Lender's satisfaction with, in its sole and absolute discretion, and the approval by the Bankruptcy Court of, the DIP Facility, any DIP Loan Documents and the transactions contemplated thereby, including, without limitation, the superpriority of, and the Priming DIP Liens and other DIP Liens to be granted to secure, the DIP Facility (all such approvals to be evidenced by the entry of one or more orders of the Bankruptcy Court satisfactory to each of DIP Lender and the Existing Lender Agent in its sole and absolute discretion (including approval of DIP Lender's fees, costs and expenses as provided for in this Term Sheet));<br><br>• the entry of the Interim Order, in form and content satisfactory to each of DIP Lender and the Existing Lender Agent in its sole and absolute discretion, within five (5) business days after the Petition Date;<br><br>• absence of (i) a default or Event of Default under the DIP Facility and (ii) any binding applicable law, regulation, ruling, judgment, order, injunction or other restraint that restrains, prevents, prohibits, restricts or imposes materially adverse conditions upon the Borrower, the DIP Facility (and the funding thereof) or the transactions contemplated by this Term Sheet or the DIP Loan Documents; |

- all substantive "first day" motions and proposed orders shall be reasonably acceptable to DIP Lender, as evidenced by its written approval;

- payment of (i) all costs and expenses required to be paid under the heading "Expenses" below on the Closing Date and (ii) all fees provided for hereunder or under the DIP Loan Documents or the Interim Order that are due and payable on the Closing Date; and

- accuracy of those representations and warranties that, pursuant to the Orders or the DIP Loan Documents, are either (a) expressly incorporated under the DIP Facility by reference to the Existing Secured Credit Facilities, or (b) expressly set forth in the Orders or the DIP Loan Documents, in each case in all material respects (except to the extent such representation or warranty is already qualified by any time of materiality, in which case, in all respects).

| | |
|---|---|
| **Conditions Precedent to Advances After the Closing Date:** | The obligation to fund Advances after the Closing Date shall be subject to the following conditions precedent:<br><br>- receipt by the DIP Lender of a borrowing request which shall (1) be irrevocable, (2) be in writing and signed by a senior officer of the Borrower, (3) be in compliance with the Approved Budget, (4) include the amount requested to be borrowed and the requested timing of such borrowing, and (5) state that no Event of Default has occurred or is reasonably likely to occur with the passage of time (a "Borrowing Request");<br><br>- absence of a default or Event of Default under the DIP Facility;<br><br>- accuracy of those representations and warranties that are expressly set forth in the Orders or the DIP Loan Documents, in each case in all material respects (except to the extent such representation or warranty is already qualified by any time of materiality, in which case, in all respects);<br><br>- since the Petition Date no material adverse change in the operations, business, properties or financial condition of the Borrower, taken as a whole (other than by virtue of the commencement of the Chapter 11 Cases and the events and conditions related and/or leading up to such commencement) shall have occurred; and<br><br>- such Advance complies with the Approved Budget; |
| **Representations and Warranties:** | The Orders or the DIP Loan Documents shall specify those representations and warranties made by the Borrower under the Existing Secured Credit Facilities that shall apply to the DIP Facility, in each instance modified as necessary to reflect the commencement of the Chapter 11 Cases. The Orders or the DIP Loan Documents may also contain such other representations and warranties as DIP Lender shall require in connection with the DIP Facility.<br><br>In addition, Debtors agree with the DIP Lender that, until the Maturity Date has occurred, the Debtors will perform or cause to be performed the |

obligations set forth below.

**Information Covenants**:

(a) Chapter 11 Cases Filings. The Debtors shall deliver to DIP Lender and the Existing Lender Agent promptly after the same is available for review (but in any event reasonably in advance of the filing thereof), copies of all material pleadings, motions, applications, judicial information, and other documents and all financial information to be filed by or on behalf of any Debtor with the Bankruptcy Court in the Chapter 11 Cases, and any financial reports to be distributed by or on behalf of any Debtor to any Committee appointed in the Chapter 11 Cases or such Committee's advisor;

(b) Budget Variance. The Debtors shall provide bi-weekly reporting in form reasonably acceptable to the DIP Lender comparing actual receipts and expenditures to those set forth in the Approved Budget. In addition, the Debtors shall promptly inform DIP Lender and the Existing Lender Agent within 48 hours of the Debtors becoming aware of a net variance from its Approved Budget projections of more than $200,000 through the date that is sixty days after the date the Chapter 11 Cases are filed; $250,000 thereafter and through the date that is one hundred fifty days after the Chapter 11 Cases are filed; and $300,000 from and after the one hundred fiftieth day after the Chapter 11 Cases are filed, and without taking into account any variance(s) over the budgeted amounts for Professional Fees and DIP Lender's legal fees in such calculation

**Affirmative Covenants**:

(a) Comply with each Order.

(b) Provide reasonable access by the DIP Lender and the Existing Lender Agent to information (including historical information) and personnel regarding strategic planning, cash and liquidity management, operational and restructuring activities.

**Negative Covenants**:

(a) Create or permit to exist any administrative expense, unsecured claim, or other superpriority claim or lien that is *pari passu* with or senior to the claims of the DIP Lender under the DIP Facility or the DIP Liens or to the liens and claims of the Existing Lenders or the Existing Lender Agent, or apply to the Bankruptcy Court for authority to do so, except for the Carve-Out.

(b) Make or permit to be made any change, amendment or modification, or file any application or motion for any change, amendment or modification, to any of the Orders, without the prior written consent of each of DIP Lender and the Existing Lender Agent in its sole

discretion.

(c) Create or permit to exist any liens or encumbrances on any assets, other than liens securing the DIP Facility and any Permitted Liens (including the liens securing the Existing Secured Facilities).

(d) Modify or alter (i) in any material manner the nature and type of its business or the manner in which such business is conducted, in each case, as such was conducted on the Closing Date, or (ii) its organizational documents, except as required by the Bankruptcy Code.

(e) Assert any right of subrogation, indemnification, reimbursement, or contribution against any other Debtor until all borrowings and obligations under the DIP Facility are paid in full and the Total Commitment is terminated.

(f) Make any payment of principal or interest or otherwise on account of any prepetition indebtedness or payables, other than (i) as contemplated under the heading "Adequate Protection" below or (ii) payments agreed in writing by DIP Lender in its sole and absolute discretion and authorized by the Bankruptcy Court

**Events of Default:** Each of the following shall constitute an event of default under the DIP Facility (each an "Event of Default"):

(a) failure to pay any interest, principal or fees when due under the DIP Facility;

(b) any representation or warranty is found to have been materially incorrect when made or deemed made;

(c) a net variance of more than the amount(s) set forth in the Budget Variance section, above;

(d) breach of any other covenant, subject to customary notice and cure periods to be agreed;

(e) conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code;

(f) dismissal of any of the Chapter 11 Cases that is without DIP Lender's written consent, in its sole discretion;

(g) the appointment of a Chapter 11 trustee or an examiner with expanded powers in any of the Chapter 11 Cases;

(h) the grant or existence of any superpriority expense claim or any lien which is pari passu with or senior to those of the DIP Lender (other than the Carve-Out and the Permitted Liens);

(i) the Bankruptcy Court's entry of an order granting relief from the automatic stay to permit foreclosure of security interests in any material assets of any Debtor; and

(j) any reversal, revocation or modification without the written consent of DIP Lender in its sole and absolute discretion of (i) the Interim Order, (ii) the Final Order or (iii) any other order of the Bankruptcy Court that could materially affect the DIP Facility in any manner adverse to the DIP Lender.

| | |
|---|---|
| **Remedies:** | As set forth in the Interim Order and the Final Order, upon the occurrence of an Event of Default and following the giving of five business days' notice to the Borrower during which period the Event of Default, if capable of cure, is not fully cured, unless otherwise ordered by the Bankruptcy Court, DIP Lender shall (a) have the right to declare the entire unpaid principal amount of any outstanding Advances under the DIP Facility, together with all accrued but unpaid interest and any unpaid fees and expenses, immediately due and payable, and (b) be deemed to have relief from the automatic stay after the passage of five days after notice is provided to the Borrower of such Event of Default to foreclose on all or any portion of the DIP Collateral, exercise collection rights as to accounts receivable, payment intangibles and other rights to payment and apply the proceeds thereof to the obligations arising under the DIP Facility, occupy premises to sell assets, or otherwise exercise remedies against the security for the DIP Facility as permitted by applicable non-bankruptcy law; *provided*, that DIP Lender shall have the right at any time to seek an order of the Bankruptcy Court to enforce the Orders or to enjoin any breach or threatened breach thereof; *provided further*, that any automatic stay otherwise applicable to the DIP Lender shall be deemed modified, without further notice, hearing or order of the Court, to permit the DIP Lender to terminate the DIP Facility as to any further Advances; *provided further*, that the DIP Lender, the Existing Lenders, and the Existing Lender Agent shall not be subject to marshalling requirements; and *provided further*, that DIP Lender's exercise of remedies shall be subject to the terms of an intercreditor agreement between DIP Lender and the Existing Lenders which provides, *inter alia*, that the Existing Secured Lenders shall at any time (other than in connection with the confirmation of a plan of reorganization) have the option to purchase all of the outstanding DIP Loan Obligations at a price equal to 100% of the aggregate amount of the outstanding DIP Loan Obligations. |
| **Expenses and Indemnity:** | The Debtors shall pay all of the documented costs and expenses of DIP Lender (upon presentation of a summary invoice redacted to protect for privileged and confidential matters) incurred in connection with the transactions contemplated by this Term Sheet, the DIP Loan Documents and the Orders, including the reasonable fees and expenses of counsel to, and other professionals and advisors retained by, the DIP Lender, as well as all expenses of the DIP Lender in connection with the administration, monitoring and enforcement of the Orders or the DIP Loan Documents, the enforcement of the Orders or the DIP Facility after an Event of Default or acceleration of the obligations under the DIP Facility, and the negotiation and documentation |

of any plan of reorganization and disclosure statement, and any other related agreements. To the extent the DIP Lender's costs and expenses exceed the amounts in the Approved Budget, such amounts shall be added to the Total Commitment under the DIP Facility and the payment of such additional expenses shall not give rise to an Event of Default.

The Debtors shall indemnify and hold the DIP Lender and its respective officers, directors, employees and agents (including all of their professionals) (each an "Indemnified Party") harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all fees and disbursements of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in connection with or arising out of or by reason of any investigation, litigation or proceeding arising out of or relating to or in connection with the DIP Facility, the DIP Loan Documents, any obligation, or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Facility, except to the extent the same is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

**Adequate Protection:** Upon entry of the Interim Order, as adequate protection, and in consideration for the consent of the Existing Lenders to (i) the use of Cash Collateral (as defined in the Interim Order) according to the Approved Budget, and (ii) the subordination of the liens granted under the Existing Secured Credit Facilities solely to the liens in the DIP Collateral in favor of the DIP Lender, the Existing Lenders shall receive (a) replacement liens and adequate protection pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code, in respect of the Existing Secured Credit Facilities, which shall be junior only to (i) the claims and liens of the DIP Lenders as described under "Security" above, and (ii) payment of the Carve-Out, (b) a superpriority expense claim against all Debtors pursuant to section 507(b) of the Bankruptcy Code junior only to the superpriority expense claims under the DIP Facility and the Carve-Out, in each case to the extent of any diminution in value, and (c) payment of all reasonable and documented postpetition fees and expenses of the Existing Lenders (in such capacity) and their counsel and other advisors incurred in connection with the Interim Order or following the Petition Date up to, but not to exceed, the amounts budgeted therefor in the Approved Budget, which, for avoidance of doubt, shall be no more than $30,000 for each of March, April and May, 2020; provided that any such fees and expenses in excess of such amounts shall be considered as part of the Prepetition Adequate Protection Rights and an additional Adequate Protection Claim in the Interim Order (it being understood that such Adequate Protection and the related Replacement Lien shall be subordinated in all respect to the DIP Obligations).

**Time of the Essence:** Time is of the essence of all obligations, conditions, and other provisions of this Term Sheet, the DIP Loan Documents, and the Orders.

APPROVED AND ACCEPTED:

BORROWER:

        COSI, INC.
        BY: _/s/ Vicki Baue_____
        ITS: Vice President

        HEARTHSTONE PARTNERS LLC
        BY: _/s/ Vicki Baue_____
        ITS: Vice President

        HEARTHSTONE ASSOCIATES, LLC
        BY: _/s/ Vicki Baue_____
        ITS: Vice President

        XANDO COSI MARYLAND, INC.
        BY: _/s/ Vicki Baue_____
        ITS: Vice President

        COSI SANDWICH BAR, INC.
        BY: _/s/ Vicki Baue_____
        ITS: Vice President

        COSI RESTAURANT HOLDINGS LLC
        BY: _/s/ Vicki Baue_____
        ITS: Vice President

COSI FRANCHISE HOLDINGS LLC

BY: *[signature]*

ITS: Vice President

**DIP LENDER**

The Lion Fund, L.P.

BY: Biglari Capital Corp.

ITS: General Partner

/s/ Sardar Biglari

Chairman and Chief Executive Officer

Biglari Capital Corp.

**EXHIBIT 1**

**APPROVED BUDGET**

**EXHIBIT 1**

**APPROVED BUDGET**

## February 24 Summary Budget

| Projected Week | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| Fiscal Period | | Feb 25 - Mar 2 W5-P2 | Mar 3 - Mar 9 W1-P3 | Mar 10 - Mar 16 W2-P3 | Mar 17 - Mar 23 W3-P3 | Mar 24 - Mar 30 W4-P3 | Mar 31 - April 6 W1-P4 | April 7 - April 13 W2-P4 | April 14 - April 20 W3-P4 | April 21 - April 27 W4-P4 |
| | | Forecast | | | | | | | | |
| **Operating Receipts*** | | | | | | | | | | |
| In-Store Receipts | | 156,369 | 177,159 | 177,159 | 177,159 | 177,159 | 175,775 | 175,775 | 175,775 | 175,775 |
| Catering Receipts | | 173,135 | 184,717 | 184,717 | 184,717 | 184,717 | 196,577 | 196,577 | 196,577 | 196,577 |
| Franchise & Royalty Receipts | | 43,619 | - | - | - | 43,619 | - | - | - | 43,619 |
| Sales & Use Taxes Collected | | 27,434 | 30,710 | 30,710 | 30,710 | 30,710 | 31,253 | 31,253 | 31,253 | 31,253 |
| **Total Operating Receipts** | | 400,557 | 392,586 | 392,586 | 392,586 | 436,205 | 403,604 | 403,604 | 403,604 | 447,224 |
| **Operating Disbursements** | | | | | | | | | | |
| Sales & Use Taxes Paid (Includes $270K pre-bankruptcy catchup) | | 270,000 | - | - | 137,168 | - | - | - | 122,838 | - |
| Wages, Payroll Tax & Benefits** | | - | 341,115 | 35,000 | 308,425 | - | 341,115 | 35,000 | 308,425 | - |
| Lease Expense | | - | 213,825 | - | - | - | 213,825 | - | - | - |
| Food & Beverage Costs (approx 24.5% of net sales) | | 82,158 | 94,294 | 92,004 | 92,004 | 92,004 | 95,915 | 93,625 | 93,625 | 93,625 |
| Paper & Smallware Costs | | 12,007 | 21,935 | 18,846 | 15,758 | 12,669 | 22,323 | 19,180 | 16,036 | 12,893 |
| Insurance*** | | 52,000 | - | 62,800 | - | - | - | 52,000 | - | - |
| Marketing Costs | | 2,463 | 8,432 | 6,324 | 4,216 | 2,108 | 8,432 | 6,324 | 4,216 | 2,108 |
| Utility Expense | | 20,298 | - | - | - | 20,298 | - | - | - | 20,298 |
| G&A (Non Payroll) | | 2,277 | 56,218 | 6,832 | 4,555 | 2,277 | 47,363 | 6,832 | 4,555 | 2,277 |
| Other Operating Expenses | | 25,179 | 61,350 | 37,765 | 29,760 | 31,691 | 58,147 | 35,362 | 28,158 | 24,247 |
| **Total Operating Disbursements** | | 466,382 | 797,169 | 259,570 | 591,884 | 161,047 | 787,119 | 248,323 | 577,853 | 155,448 |
| **Operating Cash Flow** | | (65,825) | (404,583) | 133,015 | (199,299) | 275,158 | (383,515) | 155,282 | (174,249) | 291,776 |
| **Chapter 11 Related Disbursements/Accruals** | | | | | | | | | | |
| Utility Deposits into Escrow (1 mo.-direct pay only) | | - | 20,000 | - | - | - | - | - | - | - |
| Debtor Legal Fees **** | | 20,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| Debtor Financial/Accounting Fees | | 60,000 | 12,333 | 12,000 | - | 35,000 | 112,333 | 12,000 | - | 35,000 |
| Debtor Employees Retained Only For Bankruptcy (15.5% of total Wages & Benefits) | | - | 62,571 | - | 56,575 | - | 62,571 | - | 56,575 | - |
| Creditor Committee Professional Fees **** | | 10,000 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 |
| US Trustee Fees (week 14 fees not shown) | | - | - | - | - | - | - | - | 10,000 | 9,750 |
| Claims Agent Fees | | - | - | - | - | - | - | - | - | - |
| DIP Financing Interest Payments (12% annual) and DIP related costs | | - | - | - | - | 30,000 | - | - | - | 30,000 |
| Existing Lenders Counsel Fees | | - | - | - | - | 30,000 | - | - | - | 30,000 |
| **Total Chapter 11 Related Disbursements/Accruals** | | 90,000 | 132,405 | 49,500 | 94,075 | 132,500 | 212,405 | 49,500 | 104,075 | 142,250 |
| **Net Cash Flow after Chapter 11 Disbursements/Accruals** | | (155,825) | (536,988) | 83,515 | (293,374) | 142,658 | (595,920) | 105,782 | (278,324) | 149,526 |
| **DIP Financing Availability** | | | | | | | | | | |
| Beginning DIP Availability | | 3,000,000 | 1,750,000 | 1,750,000 | 1,750,000 | 1,750,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 |
| DIP Financing Borrowing ****** | | 1,250,000 | - | - | - | 750,000 | - | - | - | - |
| **Ending DIP Availability** | | 1,750,000 | 1,750,000 | 1,750,000 | 1,750,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 |
| **Book Cash** | | | | | | | | | | |
| Beginning Book Cash | | - | 1,094,175 | 557,187 | 640,702 | 347,329 | 1,239,987 | 644,067 | 749,849 | 471,525 |
| Net Cash Flow | | (155,825) | (536,988) | 83,515 | (293,374) | 142,658 | (595,920) | 105,782 | (278,324) | 149,526 |
| DIP Financing Borrowing ****** | | 1,250,000 | - | - | - | 750,000 | - | - | - | - |
| **Ending Book Cash** | | 1,094,175 | 557,187 | 640,702 | 347,329 | 1,239,987 | 644,067 | 749,849 | 471,525 | 621,051 |
| Cumulative Operating Cash Flow | | (65,825) | (470,408) | (337,393) | (536,692) | (261,534) | (645,048) | (489,767) | (664,015) | (372,240) |
| Cumulative Cash Flow after Chapter 11 Disbursements/Accruals | | (155,825) | (692,813) | (609,298) | (902,671) | (760,013) | (1,355,933) | (1,250,151) | (1,528,475) | (1,378,949) |

**Notes**

* Assumes tips equal to 4.5% of total catering receipts, collected currently (vs. 5+% historical data)

** Includes allocation of $35,000 per payroll for unemployment taxes (highest Q1). 16% of payroll costs moved to chapter 11 related disbursements as shown below. Cosi to pay Aetna $92K outstanding balance; $35K on each of March 10, April 10 and May 11.

*** Does not include employee health and other benefits which are included in Wages, Payroll Tax & Benefits. Best guestimate used for insurance year commencing May 15, 2020.

**** Fees are shown weekly, but will be paid in lump sums per fee applications.

***** Cumulative operating cash flow in week 14 excluding sales tax makeup ($270K) and AETNA makeup ($92K) equals negative $134K

****** Last two borrowings under the DIP financing are not shown as the timing of the borrowings is not yet known.

Cash Flow Model Draft February 24    Summary Budget    Page 1 of 2

## February 24 Summary Budget

| Projected Week<br>Fiscal Period | 10<br>Apr 28 - May 4<br>W1-P5 | 11<br>May 5 - May 11<br>W2-P5 | 12<br>May 12 - May 18<br>W3-P5 | 13<br>May 19 - May 25<br>W4-P5 | 14<br>May 26 - June 1<br>W5-P5 |
|---|---|---|---|---|---|
| **Operating Receipts*** | | | | | |
| In-Store Receipts | 171,275 | 171,275 | 171,275 | 171,275 | 171,275 |
| Catering Receipts | 203,622 | 203,622 | 203,622 | 203,622 | 206,135 |
| Franchise & Royalty Receipts | - | - | - | - | 43,619 |
| Sales & Use Taxes Collected | 31,450 | 31,450 | 31,450 | 31,450 | 31,450 |
| **Total Operating Receipts** | 406,347 | 406,347 | 406,347 | 406,347 | 452,480 |
| **Operating Disbursements** | | | | | |
| Sales & Use Taxes Paid (Includes $270K pre-bankruptcy catchup) | - | - | - | 125,011 | - |
| Wages, Payroll Tax & Benefits** | 341,115 | 22,000 | 308,425 | - | 308,425 |
| Lease Expense | 213,825 | - | - | - | - |
| Food & Beverage Costs (approx 24.5% of net sales) | 96,438 | 94,147 | 94,147 | 94,147 | 94,147 |
| Paper & Smallware Costs | 25,627 | 21,673 | 13,765 | 13,765 | 13,765 |
| Insurance*** | - | - | 65,000 | - | - |
| Marketing Costs | 8,432 | 6,324 | 2,108 | 2,108 | 2,108 |
| Utility Expense | - | - | - | - | 20,298 |
| G&A (Non Payroll) | 47,363 | 6,832 | 2,277 | 2,277 | 2,277 |
| Other Operating Expenses | 62,629 | 32,786 | 18,262 | 18,262 | 22,356 |
| **Total Operating Disbursements** | 795,427 | 183,762 | 503,984 | 255,570 | 463,376 |
| **Operating Cash Flow** | (389,081) | 222,585 | (97,638) | 150,776 | (10,896) |
| **Chapter 11 Related Disbursements/Accruals** | | | | | |
| Utility Deposits into Escrow (1 mo.-direct pay only) | - | - | - | - | - |
| Debtor Legal Fees **** | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Debtor Financial/Accounting Fees | 3,333 | 9,000 | - | - | 35,000 |
| Debtor Employees Retained Only For Bankruptcy (15.5% of total Wages & Benefits) | 62,571 | - | 56,575 | - | 56,575 |
| Creditor Committee Professional Fees **** | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| US Trustee Fees (week 14 fees not shown) | - | - | - | - | - |
| Claims Agent Fees | - | - | 10,000 | - | - |
| DIP Financing Interest Payments (12% annual) and DIP related costs | - | - | - | - | 30,000 |
| Existing Lenders Counsel Fees | - | - | - | - | 30,000 |
| **Total Chapter 11 Related Disbursements/Accruals** | 95,905 | 39,000 | 96,575 | 30,000 | 181,575 |
| **Net Cash Flow after Chapter 11 Disbursements/Accruals** | (484,985) | 183,585 | (194,213) | 120,776 | (192,471) |
| **DIP Financing Availability** | | | | | |
| Beginning DIP Availability | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 |
| DIP Financing Borrowing ****** | - | - | - | - | - |
| **Ending DIP Availability** | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 |
| **Book Cash** | | | | | |
| Beginning Book Cash | 621,051 | 136,066 | 319,650 | 125,438 | 246,214 |
| Net Cash Flow | (484,985) | 183,585 | (194,213) | 120,776 | (192,471) |
| DIP Financing Borrowing ****** | - | - | - | - | - |
| **Ending Book Cash** | 136,066 | 319,650 | 125,438 | 246,214 | 53,743 |
| Cumulative Operating Cash Flow | (761,320) | (538,736) | (636,373) | (485,597) | (496,493) ***** |
| Cumulative Cash Flow after Chapter 11 Disbursements/Accruals | (1,863,934) | (1,680,350) | (1,874,562) | (1,753,786) | (1,946,257) |

**Notes**
* Assumes tips equal to 4.5% of total catering receipts, collected currently (vs. 5+% historical data)
** Includes allocation of $35,000 per payroll for unemployment taxes (highest Q1). 16% of payroll costs moved to chapter 11 related disbursements as shown below. Cosi to pay Aetna $92K outstanding balance: $35K on each of March 10, April 10 and May 11.
*** Does not include employee health and other benefits which are included in Wages, Payroll Tax & Benefits. Best guestimate used for insurance year commencing May 15, 2020.
**** Fees are shown weekly, but will be paid in lump sums per fee applications.
***** Cumulative operating cash flow in week 14 excluding sales tax makeup ($270K) and AETNA makeup ($92K) equals negative $134K
****** Last two borrowings under the DIP financing are not shown as the timing of the borrowings is not yet known.

Cash Flow Model Draft February 24    Summary Budget    Page 2 of 2