IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COSI, INC., *et al.*,[1] | ) | Case No. 20- |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

**DECLARATION OF JASON FENSTERSTOCK, PROPOSED CHIEF RESTRUCTURING OFFICER FOR THE DEBTORS, IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS IN POSSESSION TO OBTAIN POSTPETITION SECURED SUPERPRIORITY FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING ADQEQUATE PROTECTION, (IV) SCHEDULING FINAL HEARING, AND (V) GRANTING CERTAIN RELATED RELIEF**

I, Jason Fensterstock, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that:

1. I am the President of Sasco Hill Advisors, Inc. ("Sasco"), a restructuring/financial advisory services firm with an office at 53 Clinton Avenue, Westport, CT. I submit this declaration (the "Declaration") in support of *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors-in-Possession to Obtain Postpetition Secured Superpriority Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Adequate Protection, (IV) Scheduling Final Hearing, and (V) Granting Certain Related Relief* (the "DIP Motion")[2], which is being filed contemporaneously herewith. Except as otherwise indicated, all statements in this Declaration are based on (a) my personal knowledge; (b) my review of relevant documents, including the Debtors' books and records; (c) information supplied to me by other members of

---

[1] The Debtors in these Chapter 11 Cases are the following entities (the last four digits of each Debtor's respective federal tax identification number, if any, follow in parentheses): Cosi, Inc. (3745); Xando Cosi of Maryland, Inc. (2196); Cosi Sandwich Bar, Inc. (0910); Hearthstone Associates, LLC (6267); Hearthstone Partners, LLC (9433); Cosi Franchise Holdings LLC (6984); and Cosi Restaurant Holdings LLC (3461). The Debtors' corporate headquarters are located at 500 Rutherford Avenue, Suite 130, Charlestown, MA 02129.

[2] Capitalized terms used herein shall have the meanings set forth in the DIP Motion unless otherwise defined.

Cosi's management team; and (d) my opinion based on my experience and knowledge of the Debtors' operations and financial affairs.

2. The Debtors intend to file a *Motion of the Debtors for Order Authorizing the Debtors to (I) Retain Sasco Hill Advisors, Inc. to Provide the Debtors With a Chief Restructuring Officer and (II) Designate Jason Fensterstock as Chief Restructuring Officer for the Debtors, Nunc Pro Tunc to the Petition Date*, pursuant to which, *inter alia*, the Debtors are requesting approval of my designation as the Chief Restructuring Officer of the Debtors.

3. The Debtors initially engaged Sasco on December 23, 2019, and I began at that time to act as the Debtors' Chief Restructuring Officer. I have spent considerable time and effort in gaining an understanding of the Debtors' business and financial affairs and the marketplace in which the Debtors operate, and evaluating potential restructuring options with the employees and board of directors.

4. As described in the DIP Motion, the Debtors and Lion Fund, LP ("DIP Lender") have agreed to the terms of post-petition debtor-in-possession financing (the "DIP Facility"). The DIP Facility is described in detail in the DIP Motion. In sum, the DIP Lender has agreed to provide up to $3 million in post-petition financing (the "Total Commitment") to fund operations during the Chapter 11 period.

5. The Debtors, the Existing Lenders and the DIP Lender engaged in extensive, arms' length negotiations with respect to the terms and conditions of the proposed DIP Facility and the use of Cash Collateral. These negotiations culminated in agreement upon the proposed financing, including the DIP Term Sheet. Significantly, the DIP Term Sheet allows the Debtors to request the Advance of $1,250,000 upon entry of the Interim Order, pending this Court's entry of the Final Order. This interim commitment will ensure that the Debtors will be able to meet all

of their administrative obligations during the early stages of these Chapter 11 Cases as well as provide adequate liquidity to operate their business. Upon entry of the Final Order, the Debtors will be permitted to request Advances under the DIP Facility in an aggregate amount not to exceed the Total Commitment. The Debtors, the DIP Lender and the Existing Lenders have agreed upon the Approved Budget, projecting cash flow for the first three months of this case. The Approved Budget contemplates that the Debtors will have use of Cash Collateral during that time. I believe that the Approved Budget is achievable and will allow the Debtors to operate without the accrual of unpaid administrative expenses.

6. The proposed DIP Facility is reasonable and necessary. Absent immediate and uninterrupted access to adequate financing, I believe that the Debtors will not have sufficient liquidity to sustain their business and maximize the value of the Debtors' assets. In addition, without the DIP Facility, 1 believe that it would be impossible to continue operations and maintain enterprise value for any of the Debtors. Among other things, the Cosi parent company provides all support for the Debtors' operations, including the valuable use of the Cosi brand. As a stand-alone entity, without access to the Cosi brand and its support, the Debtors likely would be unable to raise the capital they need immediately to remain viable.

7. I, along with the Debtors' other officers, reached out to various parties prior to the Chapter 11 Cases in an effort to obtain debtor in possession financing.  Despite these efforts, and discussions with at least six other parties, the Debtors' efforts to secure financing on better terms were not successful. It is my judgment that obtaining financing for these Debtors is especially challenging due to the nature of the Debtors' business, their performance over the last several years (including the fact of a prior chapter 11 case) and uncertainty over the ability to restructure the Debtors' business operations as currently contemplated.  These and other factors and risks,

coupled with the relatively modest size of the required financing, make it extremely difficult, in my experience, to find a person willing to engage and perform diligence, and provide financing on reasonable terms, for these Debtors.

8. As late as one week prior to the Petition Date, all efforts at finding financing had been unsuccessful and the Debtors faced the dire prospect of the need to file for chapter 11 without having any financing in place. Ultimately, due to long standing historic business relationships between principals affiliated with the DIP Lender and one of the Debtors' directors, Andrew Berger,[3] the DIP Lender was introduced to the Debtors, and the Debtors and its directors, officers and professionals (including myself) were able to negotiate the terms of the proposed facility with the DIP Lender and its professionals over literally the last 72 hours.

9. Based on this experience, and on the totality of the circumstances, I believe that the Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503 of the Bankruptcy Code, or other sufficient financing under section 364(c) or (d) of the Bankruptcy Code, on equal or more favorable terms than those set forth in the DIP Loan Documents. A loan facility in the amount provided by the DIP Loan Documents is not available to the Debtors without granting the DIP Lender superpriority claims, liens, and security interests, pursuant to section 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, as provided in the Interim Order and the DIP Loan Documents. After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the Postpetition Financing Arrangement, including, without limitation, the

---

[3] Mr. Berger has fully disclosed to the Debtors his relationship with the DIP Lender. There are no agreements between Mr. Berger and the AB Funds in connection with the DIP Facility, except that the DIP Lender has agreed to provide the AB Funds with an option to purchase the DIP Loans in the event of a default and the exercise of remedies by the DIP Lender.

4

financing pursuant to the DIP Term Sheet, represents the best financing available to them at this time.

10.  The Debtors also request in the DIP Motion the authority to use Cash Collateral and grant adequate protection to the Existing Lenders in the form of replacement liens and the other protections described in the DIP Motion.

11.  The Debtors' ordinary course operations generate Cash Collateral through the sale of food and related items. The Debtors also generate receivables that are ultimately converted into cash from the catering business and franchise relationships.  One of the Debtors' pressing concerns is the need for the immediate use of Cash Collateral pending a final hearing on the DIP Motion. The Debtors require the use of Cash Collateral in order to meet their expenses and maintain the operation of their business. Without the use of Cash Collateral, the Debtors' operations will be substantially and irreparably harmed. The continued operation of the Debtors' business is essential to their operation during this case. In order to avoid immediate and irreparable harm to the Debtors' estates, the Debtors require the use of Cash Collateral to pay, among other things, payroll, utilities, taxes, insurance, and other ordinary business costs and expenses.

12.  The Existing Lenders have security interests in substantially all of the Debtors' Cash Collateral. As adequate protection for any interest in Cash Collateral which the Existing Lenders may have, the Debtors are willing to grant the Existing Lenders replacement liens in the Debtors' post-petition Cash Collateral and all other assets of the Debtors, subject only to the liens of the DIP Lender and the Carveout, with such replacement liens having the same extent, priority and validity as their pre-petition liens on the Cash Collateral, and only to the extent that

the Debtors use such Cash Collateral. The proposed replacement liens should provide sufficient adequate protection to prevent any diminution in value to the Existing Lenders' cash collateral.

13. The Debtors seek to use Cash Collateral in accordance with the Approved Budget attached to the DIP Motion.

14. As discussed in the DIP Motion, as of the Petition Date, the Debtors' indebtedness to the Existing Lenders' debt consists of approximately $25 million in obligations owed to the Existing Lenders under the Exit Credit Agreement and the Bridge Credit Agreement, and the approximately $6.7 million (plus accrued interest and other obligations) in obligations owed under the Rollup Notes (the "Prepetition Secured Obligations"). I understand that the Prepetition Secured Obligations are secured by a lien on substantially all of the Debtors' assets.

15. The Debtors require immediate authority to use Cash Collateral to fulfill their day- to-day operations, so as to preserve the going concern value of the Debtors. I believe that the Debtors' use of Cash Collateral is absolutely essential for the Debtors' continued operations and is therefore in the best interest of creditors and these bankruptcy estates.

16. In summary, the Debtors require the financing under the DIP Facility and the use of Cash Collateral (i) to maximize and preserve the value of their businesses while they attempt to consummate a plan of reorganization, (ii) to satisfy payroll obligations and other working capital and general corporate purposes of the Debtors consistent with the terms set forth in the DIP Loan Documents and the Approved Budget, (iii) to pay fees and expenses related to the DIP Loan Documents and these Chapter 11 Cases, and (iv) for such other purposes as are set forth in the DIP Loan Documents. If the Debtors do not obtain authorization to borrow under the DIP Loan Documents and use Cash Collateral, they will suffer immediate and irreparable harm.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: February 24, 2020    By: _____
                                Jason Fensterstock